Argued April 6, modified May 25, rehearing denied July 30, 1926.

# FRED C. BAKER ET AL. v. MULTNOMAH COUNTY.

(246 Pac. 352.)

**Highways—Evidence Held to Show That Material Excavated Under Contract With County for Construction of Highway was "Intermediate Excavation," for Which Contractor was Entitled to a Higher Rate, and was not "Common Excavation."**

1. Evidence *held* to show that certain material excavated by plaintiff under contract with county for construction of highway was "intermediate excavation," which required use of pick, and for which contractor was entitled to a higher rate, and was not "common excavation," which could be done with plow carrying a lesser rate.

**Highways—Statements by County Engineer to Prospective Bidders for Excavation Work as to What Would be Allowed as "Intermediate Excavation" Held not to Affect Written Contract Between Bidder and County.**

2. Statements by county engineer to prospective bidders for excavation work for highway as to what would be allowed as "intermediate excavation" *held* not to affect written contract between bidder and county.

**Highways.**

3. If roadmaster, in charge of highway construction work for county, put a wrong construction on specifications in contract, court will correct any substantial error resulting from such mistake, but slight discrepancies in measurements or classification should be disregarded.

**Highways—Where Roadmaster's Final Certificate as to Excavation Under Contract Between Contractor and County for Construction of Highway was Erroneous, Award Based Thereon Should be Set Aside.**

4. Where roadmaster's final certificate as to excavation for highway was erroneous, both in computation and classification and not in accordance with specifications, which were made part of contract between contractor and county, award based thereon should be set aside.

Contracts, 13 **C. J.**, p. 525, n. 37.
Evidence, 22 **C. J.**, p. 502, n. 8.
Hard-pan, 29 **C. J.**, p. 214, n. 78 New.
Highways, 29 **C. J.**, p. 609, n. 7.

From Multnomah: GEORGE W. STAPLETON, Judge.

Department 2.

This is a suit brought by plaintiffs against defendant for the purpose of setting aside an award and final estimate made by the roadmaster of Multnomah County pursuant to the terms of a contract made between the county of Multnomah by its board of county commissioners with Fred C. Baker and Wm. T. Baker, copartners, doing business as Baker Brothers, dated June 2, 1919, and for the further purpose of having the court fix the compensation to which the plaintiffs are entitled for the work they performed under the contract.

The contract provided that the plaintiff should perform all of the work of excavating and grading what is known as the "Greeley Street Extension" or "St. Johns River Road," being county road No. 932 from Willamette Boulevard to Russell Street in the City of Portland, Multnomah County, Oregon, according to the plans and specifications furnished and schedule of rates and prices set forth in the exhibits attached to and made a part of the contract.

The trial court upheld the claims of plaintiffs on the question of yardage on account of errors in the computations of quantity contained in the final estimate and awarded plaintiffs a judgment and decree for the sum of $1,357.65. Plaintiffs appeal.

The specifications contained in the contract and by which the materials excavated were to be classified, are as follows:

Classification:

Excavation shall be classified under three heads, viz.: Common excavation, intermediate excavation, and solid rock excavation.

Common excavation shall include all earth, clays, sand and gravel, or all earth, clays, sand and gravel

containing loose stone, measuring less than one half of one cubic foot, and all decomposed or soft rock that can be plowed with a good six-horse team.

Intermediate excavation shall include hard-pan, slate, shale, sandstone, cemented gravel, boulders and stone measuring less than one-half cubic yard in volume, shell rock and all other material of a rock nature or otherwise, that in the judgment of the roadmaster may be loosened with a pick, although blasting may be resorted to in order to expedite the work, and all other material which, in the judgment of the roadmaster, is not included in common or solid rock excavation.

Solid rock excavation shall include all rock found in place in ledges, and in masses, or boulders measuring more than one-half cubic yard, and which can only be removed by blasting, which fact shall be determined by the roadmaster. No claim is made for the solid rock classification and it may now be eliminated from further consideration.

The roadmaster of the county was given broad powers, as evidenced by the following quotations from the contract:

"In case of ambiguity of expression in the specifications, or doubt as to the correct interpretation of the same, the matter shall be submitted to the Roadmaster, whose decision shall be final."

We quote further from the contract as follows:

"It is mutually agreed between the parties to the contract, that to prevent all disputes and misunderstandings between them in relation to any of the stipulations contained in these specifications, or their performance by either of said parties, that the Roadmaster shall be an umpire to decide all matters arising or growing out of said contract between them."

And further:

"Partial payments on said contract not to exceed eighty (80) per cent of the work done, shall be paid at the request of the contractor once each month, said payments to be made upon estimates of the road-master, but such partial payments shall not be construed as an acceptance or approval of any part of such work or material. * *

"The Roadmaster shall, as soon as practicable after the completion of this contract, make a final estimate of the amount of work done thereunder and the value of such work and file a certificate with the county commissioners stating that the work has been fully completed according to specifications, and that the terms of the contract have been fully complied with, and Multnomah County, shall at the expiration of thirty-five days from and after such final estimate is made, and is approved by the Board of County Commissioners, pay the entire sum so found to be due hereunder, after deducting therefrom all previous payments made or to be retained under the provisions of this contract. All prior partial estimates and payments shall be subject to correction in the final estimate and payment."

The gist of the complaint sets forth the following facts: The roadmaster designated by the county as the person to supervise the work covered by the contract and determine classifications of materials, was wholly without experience in this kind of work and utterly incompetent to perform the duty imposed upon him; that the assistant whom he placed in charge of the work was likewise inexperienced, incompetent and incapable of passing judgment upon the matters which the contract left to the judgment and decision of the roadmaster; that the plaintiffs were entitled to have their work judged, determined and classified by an experienced, skillful and competent person; that not only did the roadmaster fail to

meet any of these qualifications, but he also failed to give personal attention to the work and delegated to equally incompetent assistants all of the duties which the contract specified he should personally perform, including the preparation of the final estimate; that the monthly progress estimates and the final estimate were not prepared by nor did they or any of them constitute the independent and unbiased judgment of the person upon whom the contract imposed the duty of supervising the work and preparing the estimate; that the said county roadmaster in making the said pretended final estimate failed to exercise his own personal judgment or the judgment of one competent to act, and by gross mistakes and the failure to exercise that judgment to which plaintiffs were entitled in the making of said estimates, and contrary to the requirements of the contract, erroneously classified large quantities of intermediate excavation as common excavation and refused to estimate and allow in said pretended final estimate large quantities of material which the records of the county showed were actually moved by the plaintiffs, and that said pretended final estimate, and the classification and the award so made by the said county roadmaster, are so grossly erroneous as to imply fraud and made for the purpose of or at least with the result of depriving these plaintiffs of a large portion of the just compensation due them under the terms of the contract.

The complaint further states, in substance, that the plaintiffs, by reason of the errors and gross and palpable mistakes of the county roadmaster in measuring, estimating and classifying the excavation and work performed by plaintiffs, have been and are deprived of and defrauded in the sum of $53,010.69

(corrected in the record to $52,974.16), and that the plaintiffs under the terms of said contract are entitled to have the said pretended final estimate and award set aside and the same revised and changed to conform to the actual facts, and that upon such revision they are entitled to have and recover from Multnomah County the above-mentioned sum over and above the amount of said pretended award, and over and above all sums of money heretofore received from said Multnomah County on account of the performance of said contract by the plaintiffs.

The answer of Multnomah County is a general denial of the allegations of the complaint, and the county also pleads final payment, accord and satisfaction, to wit: that on the seventeenth day of September, 1920, the defendant paid to the plaintiffs, and the plaintiffs accepted and received of and from the defendant, the sum of $3,966.49 in full satisfaction and discharge and settlement of the balance due the plaintiffs on account of said contract and of said contract and of all claims and demands of the plaintiffs against the defendant in said complaint mentioned and alleged, and in full satisfaction, discharge and settlement of all claims and rights of the plaintiffs growing out of said contract. The trial court held that neither of the alleged separate defenses was established by the defendant.

The prices to be paid the plaintiffs for the various classes of excavation as specified in the contract were 31 cents per cubic yard for common excavation and $1.05 per cubic yard for intermediate excavation, and $—— for solid rock excavation. The principal item for which the plaintiffs seek recovery in this suit consists of 69,752.04 cubic yards of material which was classified by a subordinate of the

roadmaster as common excavation when, as plaintiff claims, in fact it should have been classified as intermediate excavation for two reasons; first, because 61,627.16 yards were hard-pan *per se,* and 8,124.88 yards were "cemented gravel," and, secondly, because it could not reasonably be plowed with a six-horse team. The amount of compensation claimed to be due the plaintiffs because of these errors in classification and which the plaintiffs have not been paid, is $51,616.51.

The surveyed line of the work contemplated by the contract, approximately 9,600 feet in length, was divided into 96 or 97 engineer's stations of the length of 100 feet each. For the purpose of computing quantities and areas, the engineer's stations in the cuts were divided into segments, sometimes referred to in the testimony as cross-sections. These segments averaged from 25 to 50 feet in length, probably three to the station, or between 200 and 300 in all of the cuts. The assistants to the roadmaster, in computing the yardage in these sections, made errors in 78 of them, or in approximately 35 per cent of the total. Some of the errors were so small as to be insignificant, but many of them were substantial and they ranged as high as 3,793 yards, involving $1,176.00 in a single section. The gross yardage included in these errors was 8,037.50 cubic yards. Of this quantity 6,208.50 yards were against the plaintiffs and 1,829 yards against the county, leaving a net difference against the contractors of 4,379.50 cubic yards, which computed at the rate of 31 cents per yard, which was the lowest price for any of the classifications, amounted to a net loss to the contractors of $1,357.65, the amount allowed by the trial

court.   The defendant conceded that these errors in
the computation in the quantities had been made.

                                        MODIFIED.

For appellants there was a brief over the name of
*Messrs. Dey, Hampson & Nelson* and *Mr. Paul P.
Farrens,* with an oral argument by *Mr. Ben C. Dey.*

For respondent there was a brief over the name of
*Mr. Stanley Myers,* District Attorney, with an oral
argument by *Mr. Samuel H. Pierce.*

BEAN, J.—The trial court upheld the claim of
plaintiffs on the question of quantities.   This finding
is not contested by the county, as it has taken no
appeal.   The single question for consideration per-
tains to the classification of the materials.

The series of hills through which the excavation
was made are composed of a formation consisting of
three fairly well-defined strata.   The uppermost or
top stratum consists of ordinary soil or loam, vary-
ing in thickness from six to eighteen inches in most
places.   Some of the witnesses averaged the depth of
the top soil as one foot.   This is not seriously ques-
tioned.   Immediately under the stratum of soil, or
loam, and to the depth of from two to fifteen feet
over nearly all of the excavated areas, there was a
stratum of hard compact material which the plaintiff
asserts is hard-pan, demanding the intermediate clas-
sification.   The main controversy in this suit centers
around this stratum.

A fairly clear line of demarcation separates the
second or asserted "hard-pan" stratum from the
third stratum encountered.   The third stratum con-
sisted of a deep bed of sand and gravel, which is gen-

erally not cemented nor closely cohesive, and could be moved without difficulty under the test fixed by the specifications for common excavation. This stratum is found at depth varying from three or four feet to fifteen or eighteen feet beneath the surface of the ground, and extends beyond the depth of the deepest cuts. This material, together with a thin blanket of soil or the top stratum, involved about 80 per cent of the material moved.

Some parts of this lower stratum, however, had become so solidified that no impression could be made thereon by the use of a pick. When struck by a pick the metallic sound and the effect was the same as would be from striking a pick against solid granite. In the final estimate, made by the roadmaster and county engineer, 200 yards of it was classified as intermediate excavation.

Messrs. Huson and Griswold, the engineers who made the examination and computation on behalf of plaintiffs, found in addition to the 800 yards mentioned, 8,124.88 cubic yards of cemented gravel, which they classified as intermediate excavation, all of which the roadmaster classified as common excavation. In the second stratum, or what is termed by the plaintiffs and their engineer as "hard-pan," these engineers who examined and measured the material for plaintiffs and testified as witnesses in the case classified 61,627.16 cubic yards as intermediate excavation, making a total difference claimed by plaintiffs (which is disputed by defendants) of 69,752.04 yards, which the plaintiffs claim should be classified as intermediate excavation, under contract and specifications for which the price agreed upon was $1.05 per cubic yard, instead of $0.31, as allowed by defendant, or a difference of $0.74 per cubic yard, amounting to

$52,974.16. Plaintiff protested against the classification made by the county engineer and accepted the estimate of the roadmaster under protest. The trial court allowed plaintiffs $1,357.65, making $51,616.51, the amount in dispute on account of the difference in classification.

There were several competent civil engineers of about twenty years' experience who testified in the case, and the testimony of one Mr. H. T. Huson, who had had forty-four years' experience, including a great deal of knowledge in classifying material of the kind involved here in the construction of highways and railroads and other works. It was a pleasure to read the testimony of these eminent experts. Mr. Lyman Griswold was one of the engineers and was a witness for plaintiffs. He was also consulted by the plaintiffs at the time they made the bid for the work and during the progress thereof and became familiar with the excavation. In company with Mr. Huson, Mr. Griswold took the figures obtained from the county roadmaster's office and measured the so-called "hard-pan" strata and estimated the quantity of intermediate excavation on the work. Mr. Griswold defined "hard-pan" as follows:

"Well, hard-pan is a term that is used among grading engineers and contractors to cover an indurated material, a hard material, sometimes it is a form of clay, sometimes it is mixed with sand and gravel but it is always a material that is distinctive. It is almost invariably brown in color, and it is always stuff that cannot be reasonably plowed, in fact it isn't plowable material at all. It takes a price between common material and rock."

Mr. Huson's evidence, while not in the form of a definition, is of about the same purport. Webster's

New International Dictionary gives the definition of "hard-pan" thus:

"Any earth not popularly recognized as rock through which it is hard to dig or to make excavation of any sort. It may be: (1) semi-indurated clay, with or without admixture of stony matter; (2) cemented gravel; or (3) clay, with or without admixture of stony matter, which is very tough because of its strong cohesion."

Mr. A. K. Grondahl, a civil engineer of twenty-two years' experience, was the engineer for the county and assisted the roadmaster in the matter of the engineering construction of the road in question. He testified as a witness for defendant in defining hardpan as follows:

"A dense, almost impervious material that is very hard to remove, too hard to be removed with a six horse team, practically, that is so that you can use a run of scrapers to get rid of your material."

Captain W. D. Clark, a civil engineer of twenty years' experience, now Division Engineer of the State Highway Department, examined the road construction and testified as a witness for defendant to the purport in regard to the stratum in dispute, that the line of demarcation between the sand and the clayed soil above was not distinctly marked. He described the strata as "a heavy clayed soil," and in making the excavations for examination he used—"an ordinary pick and shovel"; that where he tested the material it could be penetrated with a shovel. This witness was asked in regard to this material—"If it was done by hand what implements would be necessary? A. Well, an ordinary pick and shovel only." That in digging a trench through that soil he thought a pick would unquestionably be used in the present con-

dition of the soil for a matter of a foot or eighteen inches, getting into the hard, dried out, more or less baked layer on top. Captain Clark stated that he was not prepared to say, had he been the engineer on the job, with an opportunity to see from day to day the manner in which it was taken out, that he would have allowed no intermediate in any of this stratum.

Captain Clark testified in part thus:

"There are several kinds of hard-pan in my judgment, and the hard-pan which from a geological standpoint, a material which under a geological definition might be called hard-pan wouldn't necessarily be the only material which in classifying an excavation under an ordinary set of specifications would be classed as hard-pan, or given the same classification under which hard-pan is included."

The definitions of these witnesses are interesting and instructive.

1. The real question for the court to determine is whether or not the material in question shall be classed as "common excavation" or "intermediate excavation." We, however, note that some of the witnesses for defendant in defining hard-pan convey an idea that it is very hard. By some it is reiterated that the material in question was not "impervious" to water and roots. Great stress is placed upon the fact that the material was not impervious to the water and is answered by one of the witnesses for plaintiff by stating that the material was not handled under water, indicating that we are to consider the material as it was taken from its natural bed.

The general definition of hard-pan, as we have seen, does not indicate that such material is impervious to water. Mr. J. A. Williams, the geologist, who testified as a witness for the county, performed an

experiment before the trial court, using a glass of water into which he dropped small portions of the hard-pan material, which quickly disintegrated. Regarding the material in dispute this witness testified that it was not hard-pan and was not ordinary soil. The engineers paid practically no attention to the water test. Mr. Kelly showed by his testimony that the water test was of no value; he stated thus:

"Q. And of course there are many hard materials, are there not, that take the intermediate classification ordinarily that water will dissolve?

"A. There are."

The classification depends upon the condition of the material when it is removed from its natural bed in the earth and not upon its condition after it has been excavated and subjected to the elements. Hard-pan is a trade term known to road construction engineers and those familiar with road building and similar work.

The testimony on both sides indicates that the material in dispute "may be loosened with a pick," and also, that it is necessary to use a pick or an instrument as effective as a pick in removing the stratum. As we understand the specification of intermediate excavation, quoted above, the test of loosening with a pick is inserted largely for the purpose of preventing the claim being made that cemented gravel, or other indurated material, should be classed as "solid rock." It also indicates that a hard stratum of earth, which if excavated by hand cannot be moved with a shovel without the use of a pick, would come within the second class, or "Intermediate Excavation." We notice that in nearly all, if not all, of the tests of the material made by the witnesses, a pick and shovel were used.

Another practical test is provided for in the first or "Common Excavation" classification, viz., "all decomposed or soft rock that can be plowed with a good six horse team." It would seem that if the stratum of earth in question could have been plowed in a practical way with a good six-horse team, so that a line of teams and scrapers could be kept moving to take the material away, it should fall in the common excavation class. On the other hand if the hard-pan, or whatever we term it, cannot be plowed with a good six-horse team in a practical, economical and ordinary way without two men to "ride the plow," or hold it in the ground, and without the material being in pieces or "chunks," two, three or four feet in size, so that in order to be loaded on a car it would have to be broken up with a sledge-hammer, then we think that under the specifications made a part of the contract between plaintiffs and defendant, the material should be classed as "Intermediate Excavation." From a careful reading and consideration of all the testimony, we believe that practically all of the material in question comes within the last-named class.

With the exception of about 400 feet at the extreme north end line of road, which was practically level and involved only shallow cutting, the work on which was done by a subcontractor, the plaintiffs themselves directly performed all of the work provided for in the contract. The work done by the subcontractor is not involved in this case. The method adopted for performing the work by the contractors was in accordance with modern approved methods. The specifications by which the tests of the material are made are said to be about thirty years old when different methods of construction were in vogue. The

classifications, however, must be made according to the specifications of the contract.

The plaintiffs proceeded as follows:

The slope of the hills being steep in order to open up the cuts to a depth at which a steam shovel could operate satisfactorily, they used what is called a Bagley scraper. This consists of a flat-bottom bucket or scraper weighing about 4,000 pounds with manganese steel teeth, somewhat similar to those employed on the bucket of a steam-shovel. These teeth are set at an angle pointing down from the edge of the scraper at about the same angle as the point of a plow would point down in attempting to plow hard ground. The scraper is pulled over the ground by means of steel cables operated by a powerful donkey-engine, stationed at a distance. The teeth will take hold of and break up ordinary ground as the scraper moves forward. The scraper as it is pulled forward is expected to fill with material loosened by the manganese steel teeth, in moving twice or three times its length. The scraper was so operated in the upper or soil stratum and in most of the sand and gravel-bed of the lowest stratum. The operation of the Bagley scraper on the Greeley Street Extension was under the direct charge of Mr. E. Mummey, who had had about fifteen years' experience in that kind of work. He testified as follows:

"Q. How did this Bagley scraper work in that material?

"A. It wouldn't work at all until we got through that upper stratum, we couldn't do nothing with it at all until we got under it, we had to fight it out and shoot it and any way to get through it.

"Q. Would it go through that material the way it went through what you understand common earth to be?

"A. No. Absolutely not."

After describing the scraper and the manner of its operation, this witness further testified:

"Q. What did it do in this material?

"A. Averaging we would haul up from fifty to a hundred feet and back up from two to three times to get two yards, or two and a half.

"Q. What is the capacity of the Bagley scraper?

"A. Four yards."

The witness further stated, in effect, that after shooting they would back up and load readily. That the scraper would wear down some of the places. It is also shown by the testimony that in operating the scraper by means of the cable the donkey-engine was placed around the corner of a hill, or bank of the kind of material in question, so that the cable would operate at an angle, pulling around the bank. Ordinarily, timbers would be placed at the corner for the cable to move against. In this instance, it worked against the hard-pan material, which it wore smooth without cutting into the bank.

It is in evidence that at the south end of the work there was some water-pipe which they desired to avoid disturbing, or digging up, so they ran the steam-shovel through and made a shallow cut, finishing above grade, and then two or three feet below that they plowed out with a plow and a good six-horse team.

The material there plowed was referred to as hard-pan. It plowed in large angular masses and, instead of going over in the form of land, it broke in large angular masses, some of which had to be broken with a sledge to be loaded into a slip scraper. In plowing, the horses would plow through the material 25 to 50 feet and then they had to stop and rest. They could

not plow the material with six horses in such a manner that a run of scrapers could have been kept busy.

Mr. Huson testified in part as follows:

"What time have you been over it?

"A. I have been over it four times to look at the work particularly; I have been through incidentally at other times, but I went over it four times.

"Q. When were those four times?

"A. The first time was on July 31, 1919, and then some time in September, I couldn't give you the exact date, I think the latter part of September, 1919. I went over the work again while they were working there on the job for the purpose of looking at the classifications, and in February, 1920, I went over it with Mr. Griswold and measured the hard-pan. Then I was over it some time later, and that date I don't remember, and I have no means of fixing it, that was about the time that the work was completed, I think it was along in July or August, 1920, but I haven't the date of that."

Mr. D. V. Lintner, chief construction engineer for the Spokane, Portland & Seattle Railway Company, testified—as a witness for plaintiff:

"Q. You are able to recognize that material as hard-pan regardless then of how they intend to take it out?

"A. Yes.

"Q. Now, in this Greeley Street Extension is there, in your judgment, any doubt that leaves room for difference of opinion as to what that material is in the engineering and contracting business?

"A. No."

It is shown that the same kind of material has been classified as hard-pan on many jobs, some in the vicinity of this work; that there is no room for a difference of opinion.

The testimony of the engineers and other experts, as well as that of lay witnesses acquainted with the

material and the manner in which it was handled, shows that immediately underneath the thin layer of common soil there was a stratum of hard material, which could not be excavated in the manner of common excavation, but that it was necessary to remove it by blasting or to loosen it with a pick or dig it out in some such difficult way.

2. The errors in computing the quantities of material made by the county roadmaster were egregious and glaring. The errors in the classification of material, which was according to the specification, "Intermediate Excavation" as "Common Excavation," were gross and palpable and to the prejudice of plaintiffs. The final estimate of the work made by the county roadmaster was not the result of the exercise of an honest judgment by that official, whether the result was occasioned by a want of attention during the progress of the construction or a lack of competent assistants furnished to him, or was intentional, we need not stop to consider. The result in either case would have the same effect, as far as the rights of plaintiffs are concerned. It is proper to say that the county roadmaster is not accused of acting dishonestly in the matter. By the evidence we are impressed with the idea that on account of the preliminary estimate of intermediate excavation made before the contract was awarded, being placed at 300 cubic yards, there was a strong endeavor to keep the figures of that classification near the latter figure. And that the roadmaster and his assistants considered that as the price to be paid for intermediate excavation was $1.05 per cubic yard the plaintiffs ought to be allowed but little for the second class of material. There was some attempt on the part of defendant to inject into the case oral statements made by the engineer for the county to prospective bidders

before the contract was awarded, concerning what would be allowed as intermediate excavation. Such talk would not affect the written contract. The contract was made by and between the county and the plaintiff and is not for the arbiter or the courts to change the agreement for the parties thereto.

The testimony is too voluminous to be set forth herein at length. We have merely tried to refer to samples thereof.

Many of the witnesses for the county examined the work about two years after it was done after the material had been subjected to the elements to some extent. It appears that the material was necessarily blasted during the time of the work, and it would seem that the natural effect of such blasting would be to change the banks from their natural condition so that an examination thereof, some time after the construction, would not be as satisfactory as one made during the progress of, or soon after, the excavation. Mr. Kelly, assistant highway engineer, upon being asked how much hard-pan he thought he would have allowed plaintiff, stated that "not having seen the work during the progress of construction I would be unable to say." The contract states thus:

"It is further understood that the profile, estimate of quantities and classification of materials accompanying these plans and specifications are only approximate, and the roadmaster reserves the right to alter the grade or alignment of the road, etc."

3, 4. The next question for consideration is whether, under the facts and circumstances of the case, the award of the arbiter should be set aside. Mr. Justice BURNETT, speaking for this court in *Johnson* v. *Prineville,* 100 Or. 105, at page 115 (196 Pac. 817, 820), stated the law thus:

118 Or.—11

"But it is well recognized that in equity the award may be set aside, where the classification is so grossly erroneous as to amount to fraud upon the contractor. This principle is enunciated in the opinion of Mr. Justice BEAN in *Sweeney* v. *Jackson County,* 93 Or. 96 (178 Pac. 365, 182 Pac. 380). It is also taught in *Oregon-Washington R. & N. Co.* v. *Spokane, Portland & S. Ry. Co.,* 83 Or. 528 (163 Pac. 600, 989, Ann. Cas. 1918C, 991), in an opinion by Mr. Justice McCAMANT."

In *Oregon-Washington R. & N. Co.* v. *Spokane, Portland & S. Ry. Co.,* 83 Or. 528 (163 Pac. 600, 989, Ann. Cas. 1918C, 991), the syllabus showing the holding of this court reads thus:

"The rule that a judgment of the chancellor cannot be substituted for that of arbitrators does not prevent courts of equity from setting aside awards of arbitrators for fraud or mistake."

In *Sweeney* v. *Jackson Co.,* 93 Or. 96, at page 120 (178 Pac. 365, 182 Pac. 380), this court recorded the following:

"If upon all the evidence it appears that the estimate is not fair, that the plaintiff has not enjoyed the privilege every man is entitled to, namely, an impartial hearing and determination, but that it appears as in this case that the estimate is based upon reports of incompetent subordinates and is grossly erroneous, then it is the duty of the court to set aside the final estimate and institute an independent inquiry as to the amount of compensation which the plaintiff has earned, and is justly entitled to under the contract."

As in the Sweeney case, we quote a portion of the language of Judge TAFT used in the case of *Mundy* v. *Louisville & N. R. Co.,* 67 Fed., at page 637 (14 C. C. A. 587):

"The authorities leave no doubt that construction contracts, in which the contractor stipulates that the engineer or architect of the owner shall finally and conclusively decide, as between him and the owner, what amount of work has been done, and its character, and the amount to be paid therefor under the contract, are legal and should be enforced. In such cases, after the work has been done, the contractor can recover nothing in excess of the amount found due by the engineer, unless he can make it appear that the engineer's decision was fraudulently made, or was founded on palpable mistake."

See, also, *Bennett Co.* v. *Twin Falls Land & Water Co.,* 14 Idaho, 5, 26 (93 Pac. 789); *Lewis* v. *Chicago etc. R. Co.,* 49 Fed. 708, 710; *Fruin-Bambick Const. Co.* v. *Ft. Smith & W. R. Co.,* 140 Fed 465, 468.

If it appears that the engineer, or roadmaster in charge, put a wrong construction upon the specification contained in the contract, the court will correct any substantial error resulting from such mistake; slight discrepancies in measurement or classification should be disregarded: *Lewis* v. *Chicago, S. F. & Co. Ry. Co.,* 49 Fed. 708–710; *Indianapolis N. T. Co.* v. *Brennon,* 174 Ind. 1 (87 N. E. 215, 90 N. E. 65, 68, 91 N. E. 503, 30 L. R. A. (N. S.) 85); *Williams* v. *Chicago, S. F. & Co. Ry. Co.,* 112 Mo. 463 (20 S. W. 631, 34 Am. St. Rep. 403).

The trial court did not see fit to disturb the classification made by the roadmaster, apparently for the reason stated in its opinion; there was no proof that the engineer in charge, or the roadmaster deliberately for the purpose of cheating and wronging, or defrauding plaintiffs, made a wrong classification of this material.   The learned trial judge said:

"The plaintiffs seem to have been content upon the trial of the case with attempting to prove that

the engineer was simply mistaken in his judgment without attempting to prove fraud or deliberate dishonesty with a purpose to wrong the plaintiffs. If, therefore, the engineer in charge or the roadmaster did not dishonestly or deliberately make a wrong classification but exercised his best judgment in making the classification, then in the face of the proof which shows that equally capable, honest and disinterested engineers disagree in their judgment as to what this classification should be, we find ourselves in that position where we would be bound to accept the judgment of the engineer in charge as final. * * "

We are unable to concur in the conclusion of the learned judge for the reason heretofore stated and from a careful reading and consideration of all the testimony. The court cannot avoid the responsibility of passing upon the question by leaving it to the opinion of the witnesses. The ultimate fact is, of course, for the court to find. Were it a jury case the court should, as far as possible, exclude the inference, conclusion or judgment of an expert witness as to the final fact: 22 C. J., p. 502, § 597.

Except for the conclusion or judgment of the engineer and witnesses, as to how the material should be classified, or when we come to the conclusion of the testimony relating to the kind, quality, hardness or softness, the manner in which it is necessarily or economically moved, and the ease or difficulty with which the excavating could be done, the evidence on which a classification can be based, produced on behalf of plaintiff, greatly overweighs that of the defendants and convinces the court beyond a doubt that nearly all of the material in question comes within the second classification of intermediate excavation.

We do not find that the testimony is balanced. It overwhelmingly overcomes the final award of the roadmaster and shows that the final certificate is er-

roneous both in computation and classification, is not in accordance with the specifications made a part of the contract, and should be set aside and a new finding made in addition to that made by the trial court.

Mr. Huson, in company with Mr. Griswold, devoted several days to the examination and measurements of the material in dispute. According to their measurements and computations there was a total of 70,764.55 cubic yards of intermediate excavation.

The testimony indicates that a portion of the material in dispute is somewhat affected and softened by moisture on the top and is softer in some places than in others. Therefore, in order to approach a percentage and not disturb the findings of the trial court in that respect: from the material in the second stratum, classified as common excavation, including that described as hard-pan and cemented gravel, being the total amount in dispute of 69,752.04, which was classified as common excavation, we deduct 4,379.50 cubic yards in certain sections which was allowed by the trial court as common excavation, at $0.31 per cubic yard, leaving 68,372.54 cubic yards, which was classified by the roadmaster as common excavation, which we classify as intermediate excavation, and allow the difference between $1.05 per yard and $0.31 per yard, or $0.74 per cubic yard, making the sum of $48,375.67, to which the plaintiffs are entitled, in addition to the amount allowed by the trial court of $1,357.65.

The decree of the Circuit Court will be modified accordingly and a judgment and decree will be entered in favor of the plaintiffs and against the defendant for the sum of $49,733.32.

MODIFIED AND DECREE ENTERED. REHEARING DENIED.

McBRIDE, C. J., and BROWN and BELT, JJ., concur.