Argued at Pendleton, May 3, modified October 19, rehearing denied November 16, 1926.

# NORTH PACIFIC CONSTRUCTION COMPANY *v.* WALLOWA COUNTY.

### (249 Pac. 1100.)

**Highways.**

1. Suit by contractor to set aside engineer's estimate of work to be paid for, *held* proper, though contract provided that such estimate should be final.

**Highways.**

2. Evidence *held* to show that estimate by county's engineer in charge of road construction was so grossly erroneous as to amount to fraud on contractor.

**Highways.**

3. Engineers who measured work of road contractor, in attempt to reach settlement as to amount due, may testify to facts thus ascertained in suit to set aside estimate of engineer in charge for county, notwithstanding latter refused to sign estimate arrived at.

**Highways.**

4. Where county's contested award to road contractor was insufficient, contractor *held* entitled to proper amount with interest at 6 per cent from date contested award was payable, in view of Section 7988, Or. L., but not to damages not based on direct consequences of default.

Highways, 29 C. J., p. 609, n. 7.
Interest, 33 C. J., p. 209, n. 89.

From Wallowa: WALTER H. EVANS, Judge.

In Banc.

### MODIFIED. REHEARING DENIED.

For appellant there was a brief over the names of *Messrs. Nichols, Hallock & Donald* and *Mr. Daniel Boyd*, with an oral argument by *Mr. James H. Nichols.*

For respondent there was a brief and oral arguments by *Mr. A. S. Cooley* and *Mr. Max Wilson.*

PER CURIAM.—The plaintiff had two contracts with the defendant county to construct two pieces of road in that county under the usual form of highway contracts, each of which contained the following provision:

"The engineer shall determine the amount or quantity of the work which is to be paid for under this contract, and decide all questions which may arise relative to the fulfillment of these specifications, and his estimates and decisions shall be final and conclusive and binding upon both parties to this contract."

When the work had been completed and accepted by the county, it became the duty of the engineer in charge of the work, as soon as practicable thereafter as agent for the county, in pursuance of the terms of the contracts, to make a final estimate of the work and the amount to be paid and it was required by the agreement that within thirty-five days from the filing of such estimate the defendant should pay the contractor the balance due after deducting all previous payments. The engineer made such an estimate on July 6, 1921, and this suit was commenced to set aside the same and to make a proper allowance for the work performed and not yet paid for. We assume from the making and filing of the final estimate that the parties treated the project as completed for all practical purposes, else why the final estimate of the engineer?

1. That such a suit may be maintained, notwithstanding the provision of the contract just quoted, making the decision of the engineer final, is well settled in this state, the latest decision being that of *Baker v. Multnomah County,* 118 Or. 143 (246 Pac. 352), in which the opinion was written by Mr. Justice BEAN.

2. Aside from the rock excavation known as "subgrade," there is no essential dispute about the quantities of excavation. The vital issue is about the classification. This provision appears in the contracts:

"Excavation shall be classified under three heads, viz.: Common excavation, intermediate excavation solid rock excavation.

"*Common Excavation* shall include all earth, clays, sand and gravel, or all earth, clays, sand and gravel containing loose stone, measuring less than one-half (½) of one cubic foot, and all material that can be plowed with a good four-horse team.

"*Intermediate Excavation* shall include hardpan, shale, sandstone, soft and decomposed rock, cemented gravel, boulders and stone measuring less than one-half (½) cubic yard in volume, shell rock and all other material of a rock nature or otherwise, that in the judgment of the engineer may be loosened with a pick, although blasting may be resorted to in order to expedite the work.

"*Solid Rock Excavation* shall include all hard rock found in place in ledges, and in masses, or boulders measuring more than one-half (½) cubic yard, and which can only be removed by blasting, which fact shall be determined by the engineer."

The testimony is quite voluminous; in fact, unnecessarily so and cannot be repeated here in detail. A dispute having arisen between the parties respecting the classification, the matter to be determined is whether the classification of the engineer in charge of the work, as agent of the county, was reasonably fair or whether it was so grossly erroneous as to amount to an injustice or fraud upon the contractor. A great many plats of cross-sections of cuts and embankments have been introduced in evidence, but as a

practical matter, analogous to the examination of long accounts, we are compelled to rely upon the testimony of expert engineers who as witnesses are skilled in the examination and computation of such data.

The road was constructed over an undulating pedregal. There was a great deal of loose rock on the surface and in places the bedrock cropped out and in other portions it was covered with only a thin layer of earth. There were many cuts excavated through solid rock. It is in the testimony that the engineer had given the county court an estimate that the whole highway could be constructed for about $28,000, but when the proposal was advertised, the cost indicated by the bid seemed to have surprised the engineer and there is a vein running throughout the testimony, and substantially admitted by him, that he considered the price of the work too high and that, in making up his estimate, he was strongly influenced by that conception, with the result that he classified the excavation as "common" to an unwarranted extent in order to pay for the same at the cheapest rates. On one contract the price for common excavation was $1.07½ per cubic yard, while intermediate was priced at $2.25 and solid rock at $5 per cubic yard. On the other those prices were respectively 95 cents, $2.15 and $4.25 per cubic yard. The engineer was greatly interested in protecting his original estimate and paying for the work at the cheapest possible price, and while properly he should protect the interests of the county, so far as he lawfully could in compliance with the contract, he would have no right to use his position as engineer in charge to do a wrong to the contractor or to violate the agreement between the principals. Whether the price was too high or too low was a question to settle at the outset by the County Court as manager of the fiscal concerns of the county.

Before any litigation was commenced, the parties called to their assistance as *quasi*-arbitrators the engineer who had charge of the work as representing the county, another engineer, H. S. Huson, representing the contractor, the plaintiff herein, and a third, Lyman Griswold, who represented neither party but was wholly indifferent between them. It was agreed in the first place that the decision of these engineers should not be binding on either party but, in pursuance of that stipulation, they went over the work together within two or three months after the completion of the road and agreed, as it appears from the weight of the testimony, upon the quantities to be allowed of each kind of excavation, aside from the question of "subgrade" excavation. However, when the report was typewritten and the prices for the various kinds of excavation were extended, the county engineer refused to sign the report. He did not make any minority report but simply refused to sign on the ground that he had not checked up the items. This report showed a large increase of solid rock excavation and materially reduced the less difficult "common" excavation. Failing to come to an agreement or settlement, this litigation was commenced, after which other engineers on both sides were called in to estimate the work.

All measurements, after the failure to agree on the arbitration so called, were made many months after the work had been completed and accepted by the county and after the road had been used considerably. It is conceded that the most accurate remeasurements of excavations and fills are to be made either as the work progresses or immediately after its completion and that the longer the lapse of time after the work is finished before remeasurement is undertaken, the less accurate the same will be. Most of the classifi-

cations on both sides of the controversy are in excess of those allowed by the engineer.

As to quantities, the principal dispute is as to the matter of subgrade in solid rock excavation.

In considering the weight of the testimony, where we are called upon to retry the question of fact upon the record presented before us, we must consider the statements of all the witnesses and their biases, prejudices or self-interests and reach a conclusion as best we may consistent with some reasonable view of the testimony.

As stated, all the engineers who testified on the subject were partisans of one party or the other. A partial exception to this statement is found in the fact that the engineer Griswold was selected as an indifferent party in the so-called arbitration measurement of the work. At that time he was, in fact, indifferent between the parties in connection with the remeasurement of the work. He had the advantage of examining the work while it was yet new, whereas the engineers called for defendant, with the exception of the county engineer himself and the possible exception of the witness Baldock, viewed it after the grading had been subject to the action of the weather, settlement of embankments, use by vehicles, and stock being driven over the road, thus destroying the lines of excavation and fill to a considerable extent.

The matter of subgrade might be viewed in two aspects: One as a matter of law on the construction of the contract as to whether or not it was required by that instrument independent of the direction of the engineer, and the other as a matter of fact whether there was any subgrading or not. The report of the three engineers selected in the *quasi*-arbitration affair made no mention of subgrade in their report. There is considerable testimony to the effect

that there was nothing of that kind whatever and, from a careful consideration and comparison of all the evidence, we have arrived at the conclusion that the plaintiff has not established by a preponderance of the evidence his contention on that question. That element must, therefore, be eliminated. In that view it is not necessary to discuss the matter as a question of law arising on the construction of the contracts.

3. As to the remainder of the work, we conclude from all the circumstances of the case that the estimate of the engineer Griswold made in connection with the *quasi*-arbitration scheme and practically assented to by the other two members of that board is the most reliable of all the testimony and hence we adopt it as a solution of the case. It is true that an offer of compromise is not to be introduced in evidence but that is not this case. The three men who measured the work at that time ascertained some facts. They were not disqualified as witnesses to testify to the facts which they thus ascertained. If by measurement they found that a certain cut involved the excavation of fifty yards of stone and seventy-five yards of intermediate excavation, they could testify to that effect as witnesses, although the arbitration failed and came to naught.

Under the classification substantially agreed to by the three arbitrators there was due to the plaintiff on one contract $56,394.32 and on the other contract $27,006.05, a total of $83,400.37. Deducting therefrom the admitted payments amounting to $61,681.85, there remains a balance due the plaintiff in the sum of $21,718.52.

4. The contested award was made July 6, 1921. The engineer allowed to the plaintiff only the sum of $828.37, which according to the great weight of testi-

mony was grossly inadequate. As we have determined the proper amount to have been awarded to the plaintiff at that time was $21,718.52, it became the duty of the defendant to pay that amount to the plaintiff within thirty-five days thereafter, or on August 10, 1921. Under the provisions of Section 7988, Oregon Laws, interest at the rate of 6 per centum per annum

"shall be payable in the following cases, to wit:

"1. On all moneys after the same became due; provided, that open accounts shall bear interest from the date of the last item thereof."

The plaintiff is entitled to interest on the balance found due as stated from that date.

Much evidence has been given designed to support a judgment for damages against the defendant; for illustration, for traveling expenses in search of money with which to pay the employees of the plaintiff and for salaries of its officers while waiting for settlement with the county and other like claims. The whole duty of the county was to pay a sum of money. For its failure to do so, the ordinary measure of damages is the interest on that money at the statutory rate. The claim for damages as portrayed in the evidence on behalf of the plaintiff is not based upon the direct consequences of the default of the defendant and hence cannot be allowed. The plaintiff must be content with the interest on the amount of money that ought to have been paid to it thirty-five days after the filing of the report, which report must be considered as amended to include the sum we have allowed.

The decree, therefore, will be that the award of the engineer will be set aside and the plaintiff will recover

the sum of $21,718.52 with interest thereon at the rate of 6 per cent per annum from August 10, 1921, until paid.

MODIFIED AND DECREE ENTERED. REHEARING DENIED.

RAND, J., did not participate in this decision.