**NORTHERN PAC. RY. CO. v. TWOHY BROS. CO.***

No. 8594.

Circuit Court of Appeals, Ninth Circuit.

March 1, 1938.

*Writ of certiorari denied 58 S.Ct. 1049, 82 L.Ed. ——.

Charles A. Hart, of Portland, Or. (L. B. daPonte, of St. Paul, Minn., and Carey, Hart, Spencer & McCulloch, of Portland, Or., of counsel), for Northern Pac. Ry. Co.

DeLancey C. Smith, of San Francisco, Cal., and W. Lair Thompson and McCamant, Thompson, King & Wood, all of Portland, Or., for Twohy Bros. Co.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

Appellant railway company appeals from a judgment in favor of appellee, railway building contractor, awarding damages for two breaches by the railway of a contract under which the contractor was to do the work of construction and during construction the commercial haulage upon a branch line railway. The branch, some forty-one miles long, extended from Orofino, Idaho, to a destination called Headquarters in a pine-forested area, which the road was to penetrate, and whose logs were to be its principal freight.

Appellee contractor brings a cross-appeal, later considered.

A. One of the items of damage awarded the contractor was based upon a claimed right of the contractor to haul in its work trains, during the period of the construction of the branch line, commercial freight, i. e., logs and other goods not used in construction.

The railway contended that under a stopping work clause of the contract the

222

work of commercial haulage could be, and was, stopped without liability other than for the work of haulage already done. It gave such notice on July 8, 1927, when twenty-nine miles of the road were graded, railed, and sufficiently ballasted for the hauling of logs, and thereafter hauled the commercial freight in its railway log trains.

The railway further contended that, even if the contractor had been improperly deprived of the haulage, the court's award was based on a wrong theory of fixing the damage.

■ The contract gave to the contractor the right to, and required him to, perform two classes of work: (1) To construct the entire branch line; and (2) do nonconstruction work, such as hauling the commercial freight for third parties in its work trains. There is no merit to the railway's contention that both were construction. The contract terms "construction" of the railway and the operation of "commercial haulage" themselves seem mutually exclusive in function. The contract so treats them. In its paragraph entitled "Work" it describes the contractor's agreement to "construct" with the various incident of construction such as "clearing, grubbing culverts, bridging tunnels, track laying, ballasting" and then provides for *other* work for which prices are hereafter named." Later, in the body of the contract, the "prices" for "other work" referred to in the "Work" clause and descriptions of the haulage operations appear under the title "Prices for Work," as follows:

"(72) Handling, prior to date line is turned over to *Operating Department of the Company, all commercial business,* material and empty cars of the Company used in *commercial service* and in the service of other contractors, to include all necessary switching and spotting and apply to empty car movement from point of origin of the empty car to the *loading site and loaded car return to the operated lines of the Company,* per mile..........$1.00"
(Italics supplied.)

The commercial business is something for the "Operating Department" after construction. It is none the less operating as distinguished from construction if done during construction.

■ All this work of both classes was agreed to be completed by September 1, 1927. The contractor was to do all of both classes of work, unless, so far as concerns this item of the appeal, the carrier could at any time stop work on any portion of the line's construction or the work of commercial haulage and continue it with carrier's employees to the exclusion of the contractor and without responsibility to it under the following clause:

"Stopping work.

"The Company at any time before completion may stop the work or any part thereof, or may reduce the force employed or retard the work or any part thereof. On receiving such direction the Contractor shall stop work or diminish the force as directed, and shall have no claim whatsoever for damages by reason thereof, but shall receive payment for the work done in full discharge and satisfaction of all demands against the Company. Any notice given by the Company under this paragraph shall be in writing signed by the Chief Engineer, and shall be delivered to the Contractor or some person on the work representing him at least five (5) days prior to the required stoppage or reduction." (Transcript, 68.)

The question on the legal construction of the contract is whether the "work" which the railway could stop under this "Stopping work" paragraph was the contractor's work, *which it was engaged to perform,* or the work itself of building the railway and carrying the commercial freight, by *whomsoever* performed. Was it still "work" within the meaning of that term in the contract, though performed by the railway after the contractor had been stopped? If the latter, the work itself could not be continued and performed by some one else without a breach of the agreement that the contractor was to perform it.

The clue to the construction of the term "work" is contained in the succeeding paragraph dealing with the construction of the railway if the contractor was not progressing with the *"work* as fast as necessary or with sufficient force" and permitting a termination of the contract by the railway. The clause treats the word "work" as something continuing after the railway declared the contract to be terminated. It is as follows:

"Accelerating work.

"If at any time the Contractor shall not be in the opinion of the Chief Engineer

progressing with the work as fast as necessary, or with sufficient force to insure its completion within the contract time, the Chief Engineer may direct the Contractor to put on such additional force and means as in his judgment are necessary, and on the failure of the Contractor to comply with such directions, the Chief Engineer may declare this contract terminated; and in such case the amount of moneys then remaining unpaid including the percentage retained on all monthly estimates, *shall be kept by the Company until the Work is completed,* and the Company may employ such force and means as in its judgment shall be necessary *to complete the work* and the cost thereof shall be paid by the Contractor." (Italics supplied.) (Transcript, 68.)

We do not find any ambiguity here warranting evidence to explain the term "work." The company had the right to stop the building of the road or commercial hauling by any one, but, in the absence of some failure on the part of the contractor, it could not continue such building or hauling by itself or a different contractor without violating its agreement that the contractor should do all the work of building and hauling.

However, were the term "work" still ambiguous as to its interpretation, we are required to interpret it against the railway, since it prepared the contract headed "Form 109-A General Contract" which the contractor signed. Sartoris v. Utah Construction Co., 9 Cir., 21 F.2d 1, 2.

The railway argues in support of the contrary construction that it created no hardship to the contractor to require it to stop work, since the work, including haulage, was to be paid for at unit prices and not by a lump sum for the line and haulage as a whole. Were such a consideration pertinent, it may well be that the haulage, though at the same rate per car mile in the earlier, as the later, stages of the contract, becomes much easier for the contractor to earn by his work trains as the railway construction becomes progressively more suitable for train traffic. However, the gain to the one party or the other is not a factor in construing the contract. If the railway had the right under the contract to stop the contractor's work, its motive, whether gain or mere petulance of its officers, would not affect its right. Security-First-Nat. Bank v. Rindge Land & Nav. Co., 9 Cir., 85 F.2d 557, 561, 107 A.L.R. 1240. The question here is determined within the four corners of the railway's form contract, and that determination entitles the contractor to damages for the haulage which the railway took away from the contractor and itself performed.

We are able to find but one case dealing with a clause having like effect. There it was held to give the carrier the right to stop the entire work. The question of continuing the work by the carrier or another contractor was not involved, but, in holding the clause valid where the construction was stopped, the Eighth Circuit Court of Appeals said: "Such stipulations are sometimes found in contracts for the construction of railroads, and for the doing of other work of a like character, where *unforeseen events* may occur to render a *temporary or permanent suspension of the work* both desirable and necessary." (Italics added.) Warren-Scharf Asphalt Paving Co. v. Laclede Const. Co., 1901, 8 Cir., 111 F. 695, 696.

In Wortman v. Montana Cent. Ry. Co., 1899, 22 Mont. 266, 56 P. 316, the court upheld the right of the owner to stop the contractor's work on a tunnel under a somewhat similar stop work provision, but there the court found that nothing was done after the stop work order except protection work performed by the contractor.

In the following cases where have been considered the right of the owner to take from the contractor part of the work as "omissions," it was held that this meant omissions in the structure itself and not omissions of a portion of the contract, which could be given to another without incurring liability to the contractor. Shaver v. Murdock, 1868, 36 Cal. 293, 297; Gallagher v. Hirsh, 1899, 45 App.Div. 467, 61 N.Y.S. 609, 613.

In a Massachusetts case a clause giving the railway the right "to suspend the progress of the work," on demurrer, was held to give the right not only to stop the contractor's performing the contract but to permit continuing the work by other persons. This case does not consider the construction of the clause in connection with any such other clause as that just succeeding the "stopping work" clause in the contract here litigated, nor did it appear that the contract was drawn by the railway and, hence, should be construed against it. Marsch v. Southern New Eng. R. Corp., 1918, 230 Mass. 483, 120 N.E. 120, 124. The subsequent history of the case shows a dismissal on the sustaining of the demurrer, Id., 235 Mass. 304,

126 N.E. 519, a commencement anew of the same cause in the federal court and a judgment for large damages confirmed on appeal, but without discussion of the point in question, Id., 1 Cir., 45 F.2d 766, 767.

The District Court found the amount of damages to the contractor for the withdrawal of the commercial haulage of logs by its work trains, to which finding no exception was taken by the railway and upon which amount of damage the railway requested no finding of fact. The railway contends that the finding violates a requested conclusion of law to the effect that it was not obligated, as a common carrier or by the contract, to engage in the commercial haulage of logs upon which damage was claimed by the contractor and awarded by the court and, hence, the amount of logs actually transported by the carrier during construction was not the basis of determining the damage. The request was as follows: "Defendant was under no legal obligation to engage in common carrier transportation when it took over the first twenty-nine miles of its line from plaintiff, and was not obligated to accept log traffic to be handled thereon. The amount of log traffic accepted and transported by defendant after so taking over this portion of its railroad cannot be taken as the measure of what log traffic would have been accepted and transported if said portion of the line had remained in the control of plaintiff as contractor."

There was sufficient evidence to infer that the railway had become a common carrier of logs. Prior to ousting the contractor, the railway filed its log tariff with the Interstate Commerce Commission and its answer (Tr., 36) admits that it " * * * thereafter, pursuant to an *agreement with an owner of timber,* engaged in the transportation of logs on said portion of said railroad."

Contractor hauled some of these logs in its work trains prior to the railway's taking over of the commercial haul and had adequate work train equipment to haul all hauled by the railway. We hold there was no error in not construing the evidence of damage under the requested conclusion of law.

In later considering the cross-appeal, we take up the question as to whether the amount allowed for the breach concerning the commercial haul was sufficient.

B. The second issue raised by the railway's appeal concerns proper compensation under the contract for the hauling by the contractor of construction materials to the sites of bridges on the line. The contract specified certain prices for the hauling of certain bridge materials, as follows (Tr., 59, 60):

"(37) Hauling piles furnished by the Company per lineal foot per mile 0.02
"(38) Hauling Timber furnished by the Company, per thousand, F. B. M. per mile 0.85
"(39) Hauling metal fastenings, per ton per mile 0.65"

The contractor hauled several items of this described material to bridge sites, via railroad. The court found earnings and awarded compensation according to the quoted schedules. The railway claims this finding and award is a wrongful interpretation of the contract, concerning which it requested an interpretation, as follows: "Plaintiff was not entitled, under the terms of its contract with defendant, to receive compensation for bridge materials hauled by rail at prices applicable to so-called team haul. The term 'team haul' as used in the contract meant transportation by team, truck, or by hauling on skid roads, and not transportation by rail upon the newly laid track."

The word "hauling" in the above-quoted portions of the contract, concerning the bridge materials, is not ex vi termini a "team haul." The term "team haul" is not used in the contract in connection with any price.

It is apparent from the specifications that the road was being built through a rough and timbered country with streams and canons and steep inclines to be traversed and stumps to be avoided during the advance work. Hence, the term "hauling" is inclusive of hauling by locomotive engine, by truck, caterpillar, tractor, skidway, or team. There are specific prices fixed in the contract for "hauling" twenty kinds of material.

As to seventeen of these items, the railway does not contend that when they are hauled by a locomotive engine the prices do not apply, but claims that the three items of (37) "piles" and (38) "Timber" when "furnished by the Company" and (39) "metal fastenings" and *only when hauled*

*to bridges,* are not to be hauled at the specified prices *if hauled by train.* In the exceptional haul of these items to bridges by train the company claims they fall under a general train hauling provision in which the price is much lower. That general provision makes no mention of the hauling to bridges. It is (Tr., 63–64): "(72) Handling, prior to date line is turned over to Operating Department of the Company, all commercial business, material and empty cars of the Company used in commercial service and in the service of other contractors, to include all necessary switching and spotting and apply to empty car movement from point of origin of the empty car to the loading site and loaded car return to the operated lines of the Company, per car mile $1.00."

Waiving the pregnant question whether the word "material" in item (72) includes construction material and assuming against the contractor's contention that it does, it is apparent that its general provision of a hauling price for the material is controlled by the particular price provisions for the three specified kind of materials of items (37), (38), and (39). There could not be a clearer case of the particular controlling the general.

The railway contends that this canon of construction does not control in locomotive engine hauling to bridges, by reason of a provision, not in the main contract, in which the price schedule is contained, but in a portion of an attached specification, which provides: "Bridges must be erected ahead of the track in all cases but the maximum *team haul* of materials shall not exceed four miles except on written orders of the Engineer." (Italics supplied.)

The railway argues that the only purpose of limiting the "team haul" to bridges to four miles is to save the higher price of such hauling, ergo, the "hauling" of piles and timbers and fastenings to bridges must mean team hauling and not hauling by locomotive engine.

The assumption that, though price is not mentioned, this is the only purpose attributable to the four-mile limitation of the bridges from the tracks, that is, to keep down the prices of hauling, seems far fetched. Its fallacy is clearly shown when we consider the roughness of the terrain and the character of the materials the railway furnished to be carried over it.

The specifications provide for piles over forty feet in length. In great detail their particular and high qualifications are specified (Tr., 120). Dropping the ends of such piles over many miles of rough, unbroken country, down and up ravines and through rivers and streams, bumping them against stumps and rocks, and the like, may be very costly to the railway. Likewise, as to the bridge timbers, of which it takes nearly two pages of the transcript to detail their peculiar and high requirements.

It is reasonable to suppose that this haulage was limited to four miles of the forty-one miles to be constructed to prevent the contractor from sending his bridge crews too far ahead of grading and track laying, as it might be tempted to do to keep them continuously employed and not have them disperse.

The District Court committed no error in computing the damage for these items at the hauling price specified for each, whether or not they were hauled by a locomotive on a track laid to the bridge.

▆▆▆ Since, as a matter of law, we find no ambiguity in the term "hauling" as used in these items, there was no error in the rejection of a decision to the contrary by the railway's chief engineer under a clause of the contract attempting to refer disputes of legal interpretation to him. There was no notice for hearing upon the legal question involved. His ruling was a gross mistake of the law, and the court's finding that the chief engineer's act was "arbitrary and coercive" is supported by the evidence of such coercive attitude toward the contractor, entirely apart from, and in addition to, this patent error of his legal interpretation of the contract terms. Since, if there had been any ambiguity in the terms of the "form" contract drawn by the railway, the railway's chief engineer would have to construe it against his employer (Sartoris v. Utah Construction Co., supra), it is apparent that the evidence intimating his bias against the contractor makes him an improper person for such legal adjudication and his decision not binding on the court—even assuming that such legal questions can be determined by the employee of one party in favor of that party's interest when bound by a rule of legal interpretation against the employer's interest. Compare North Pac. Const. Co. v. Wallowa County, 119 Or. 565, 249 P. 1100, considered infra.

In United States v. Gleason, 1900, 175 U.S. 588, 20 S.Ct. 228, 44 L.Ed. 284, the Supreme Court upheld a contract pro-

vision giving to the engineer the final and conclusive right to determine the fact of the contractor's conduct as warranting an extension of time beyond that agreed for the completion of the work, but stated the law to be that such finality existed only "in the absence of fraud or of mistake so gross as to necessarily imply bad faith." United States v. Gleason, supra, 175 N.S. 588, 602, 20 S.Ct. 228, 233, 44 L.Ed. 284, cited in McCullough v. Clinch-Mitchell Const. Co., 1934, 8 Cir., 71 F.2d 17, 20, where at page 21 the kind of facts submitted are described.

If an arbitrary, gross mistake defeats an express decision on disputed facts, a fortiori should it defeat the right to make a decision on a question of law by an engineer exercising a coercion on the contractor.

### Cross-Appeal of the Contractor.

■ C. The contractor assigns error in the failure to allow interest on the award for his cause of action for the haul for bridge materials. Here, there was no dispute as to the character or amount of the materials hauled. The controversy involved a mere question of law in the interpretation of the contract. If determined one way, the amount due was fixed by one provision of the contract; if another, it was fixed by another set of prices in the contract. The District Court erred in not allowing interest from February 1, 1928, the date claimed by the contractor's complaint for the commencement of the running of interest. It was due from at least that date and the judgment should be modified in this regard.

It has sometimes been loosely stated that interest will not be allowed in Oregon upon damages for breach of contract. This statement is contrary to the statute providing for interest at the rate of 6 per centum per annum: "On all moneys after the same becomes due; provided, that open accounts shall bear interest from the date of the last item thereof." Or.Laws, § 7988.

■ In all such cases, there has been a breach of contract, express or implied, to pay the money, and damages are recovered for the nonpayment and the interest is upon the amount of such damages. Here was clearly such a case. The contract was for an amount of money due for an agreed service of the carrier, performed accordingly. Hill v. Wilson, 1928, 123 Or. 193, 261 P. 422.

■ D. The contractor asserts error in the failure to allow interest on the amount awarded on his cause of action for breach of the contract under which the contractor would have received from the railway the contract rate of $1 per car mile on the total car miles which the railway hauled between July 17 and September 1, 1927, payable under the contract on the 20th of the second month after the haulage (Tr., 67). The court properly allowed as an offset on this total amount the contractor's cost of handling and awarded $125,000 as the net amount the contractor would have left if the railway had not failed to pay its agreed prices. The court refused interest on this amount prior to the judgment.

Since the railway wrongfully denied the right of the contractor to such payments from as early as July 7, 1927, the contractor thereafter had a claim for money compensation for breach of the contract of which the amount was ascertainable after September 1, 1927.

If the railway had not prevented the contractor from hauling the commercial freight, it would have been liable for interest on the $1 per car mile due the contractor if not paid; nevertheless, the railway claims that by preventing the haulage it escapes all interest on the moneys it owes. That is to say, on the one hand, if the railway rightfully permits the contractor to earn the commercial haulage, but wrongfully refuses to pay what is due the contractor, he must pay interest from the date the moneys were due. If, on the other hand, it commits two wrongful breaches of the contract, first, in preventing its performance, and, second, in nonpayment of the amount due, the dual breach enables the contract breaker to have the use of the moneys due the contractor and deprive the contractor of its use until the court compels its payment—here, $125,000 for ten years.

The contractor contends that by a specific provision of the contract the money due on this claim was agreed to be paid within thirty days after the contract was fully performed. The provision is:

"Final estimate.—Time of payment of final estimate and retained percentage. Release.

"When in the opinion of the Chief Engineer this contract shall have been performed, he shall so certify in writing and give a final estimate and statement of the balance unpaid; and the Company within thirty days thereafter will pay the full balance. The Contractor at final payment will

execute, acknowledge and deliver to the Company under *his* hand and seal a valid *discharge* from all *claims* and *demands growing out of* or *connected* with this contract." (Italics supplied.)

It will be noticed that what is here provided to be given the railway is *"his,"* the contractor's, discharge of the railway from the contractor's demands against the railway and not any clearance of the liens of others for material or services.

Like the other provisions of the form contract, any ambiguity in it must be construed against the railway which drafted it. However, it is not necessary to invoke the rule of construction. The requirement that *at the time* of final payment the contractor shall deliver "a valid discharge from all claims or demands growing out of or connected with this contract" requires the construction that the "full balance," which the railway in the previous sentence promises to pay, includes the claim of the contractor for breach of the railway's agreement to allow the contractor the commercial haul and pay $1 per car mile for it. It has the unique quality of a specific promise to pay on a specified date, not only the money agreed to be paid for the work done under the contract, but also the money due on claims for breach of the contract by the railway.

The word "money" is properly used, because only if the claim were ascertained in its money equivalent could it be included in the "balance," which is promised payment and for which the contractor must give his "valid discharge." The claim is, therefore, one for "money" which was promised payment and "became due" on February 1, 1927.

That through the wrongful refusal of the railway to recognize this claim of damages, its money amount was not stated in the "final estimate" of the engineer upon which the computation of the unpaid balance was made, does not alter the promise to include it and pay it in the balance. The award to the contractor is, thus, clearly within the Oregon statute (Or.Laws, § 7988) allowing interest at 6 per centum per annum: "On all moneys after the same becomes due; provided, that open accounts shall bear interest from the date of the last item thereof," and the court erred in refusing it.

Earlier Oregon cases refusing interest for breach of contract to deliver or to accept contract logs or other merchandise and involving ascertainment of market value over or under the agreed price and liquidation of the damages have no such clause agreeing to pay unascertained damage on a date fixed by the contract. Williams v. Pac. Surety Co., 77 Or. 210, 146 P. 147, 149 P. 524; Duncan Lumber Co. v. Willapa Lumber Co., 93 Or. 386, 182 P. 172, 183 P. 476. These cases seem overruled by the reasoning in North Pac. Const. Co. v. Wallowa County, 119 Or. 565, 572, 249 P. 1100, 1101, so far as they hold that any lack of liquidation of damages defeats any right to interest under the Oregon statute.

The Wallowa County Case involved a construction contract under which the engineer of Wallowa county was required to determine the amount of work done and "his estimates and decisions shall be final and conclusive and binding upon both parties to this contract." The final payment clause does not appear in the opinion, but is described, at page 566 of 119 Or., 249 P. 1100, 1101, as requiring the engineer "To make a final estimate of the work and the amount to be paid, and it was required by the agreement that, within 35 days from the filing of such estimate, the defendant should pay the contractor the balance due after deducting all previous payments. The engineer made such an estimate on July 6, 1921, and this suit was commenced to set aside the same and to make a proper allowance for the work performed and not yet paid for."

Continuing, the court holds: "[1] That such a suit may be maintained, notwithstanding the provision of the contract just quoted, making the decision of the engineer final, is well settled in this state, the latest decision being that of Baker v. Multnomah County [118 Or. 143], 246 P. 352, in which the opinion was written by Mr. Justice Bean."

The engineer made his final estimate and, despite "the conclusive and binding" quality of the estimate upon both parties, the contractor brought a suit against the county to have determined and liquidated his claim for an additional amount in dispute concerning the *quantity* of rock excavation known as "Sub-grade" and the classifications of the grades of other excavation work of agreed quantity as among those provided in the contract at agreed prices. The court held that, despite the engineer's estimates, his award could be contested and it liquidated the amount of additional dam-

ages to which the contractor was entitled. It then allowed interest at 6 per centum on that amount from the end of the 35-day period from the making of the award, in the following language:

"[4] The contested award was made July 6, 1921. The engineer allowed to the plaintiff only the sum of $828.37, which, according to the great weight of testimony, was grossly inadequate. As we have determined the proper amount to have been awarded to the plaintiff at that time was $21,718.52, it became the duty of the. defendant to pay that amount to the plaintiff within 35 days thereafter, or on August 10, 1921. Under the provisions of section 7988, Oregon Laws, interest at the rate of 6 per centum per annum 'shall be payable in the following cases, to wit:

" '(1) On all moneys after the same becomes due: Provided, that open accounts shall bear interest from the date of the last item thereof.'

"The plaintiff is entitled to interest on the balance found due, as stated, from that date." (Italics supplied.)

After disallowing certain consequential damages, such as the cost of searching for a lender who would advance the money to pay the employees of the plaintiff while waiting for settlement with the county, the court continues regarding the allowance of interest:

"The plaintiff must be content with the interest on the amount of money that ought to have been paid to it 35 days after the filing of the report, which report must be considered as amended to include this sum we have allowed.

"The decree therefore will be that the award of the engineer will be set aside, and the plaintiff will recover the sum of $21,718.52 with interest thereon at the rate of 6 per cent. per annum from August 10, 1921, until paid." (Italics supplied.)

Here, we have an Oregon case in which an unliquidated amount of money, claimed as damages under a construction contract, is deemed "to have become due" under the provisions of the contract at the end of 35 days after the final award by the engineer upon the completion of the construction enterprise. This is held although, unlike the railway form contract, the contract itself does not provide that a claim for unliquidated damages by the contractor against the owner shall be payable on a certain date and, hence, "become due" on that date.

■ E. The contractor claims further error in that damages were refused for a claimed breach of the contract in the railway's refusal to increase the compensation to be paid the contractor by reason of the vastly increased work and difficulty which the job required in excess of the data and profiles sent out with the invitation to bid. It is argued that contractor made its bid on the basis of the 'data submitted, whereas the work required was essentially different.

The assignment of error attempting to raise this question is patently insufficient (Tr., 373). There is no error assigned to any of the court's findings or conclusions or to the denial of any requested findings. Error is assigned merely to the rejection of evidence. The evidence rejected is claimed to be the invitation to bid with accompanying data. The assignment does not "quote the full substance of the evidence" rejected, as required by our rule 11. Furthermore, the record shows no ruling of the court rejecting evidence. This assignment presents nothing for review.

■ F. The time for the construction of the railway was extended from September 1, 1927, the original completion date, until January 1, 1928. The contractor in suing for the deprivation of the opportunity to handle the commercial log haul on the new tracks claims that its right to this haul continued until January 1, 1928. It complains of the action of the court in limiting its recovery to the lost carriage up to September 1, 1927, the date on which the contractor agreed to complete both the work of construction and the work of commercial hauling (Tr. 52).

The court found that by permission of the defendant the plaintiff continued the construction work beyond the stipulated time, but that defendant did not permit an extension of the commercial haulage privilege beyond September 1, 1927. This is obviously correct because contractor's cause of action is based on the claim that it was not permitted to do the work of commercial hauling after July 17, 1927.

Error is assigned to the court's holding that plaintiff's pleadings do not present the issue of the right to the commercial haul during the extended period of the construction. The contractor's contention has no merit, for the allegation of the complaint is: "That because of the matters and things

hereinbefore alleged, defendant permitted plaintiff without objection to extend the time of completion *of said railroad* to January 1, 1928 at which time plaintiff had fully completed said railroad and the same was accepted by the defendant and turned over to defendant's Operating Department on said date." (Italics supplied.)

The permission for extension of time to do the work of construction of the railroad is not an extension of time to do work other than construction, such as commercial hauling. The next paragraph of the complaint alleges this was not permitted after July 17, 1927. There was no error in denying damages for the claimed deprivation of the commercial haul after September 1, 1927.

The judgment should be modified to include interest at 6 per centum per annum from February 1, 1928, on the damages both for the cause of action based on the deprivation of the commercial haulage and for those based upon the hauling of bridge materials.

Otherwise, it is affirmed.