Argued March 21, reversed June 25, rehearing denied September 17, 1929.

# WARD MAYER ET AL. *v.* EAST SIDE LOGGING CO.

(278 Pac. 957; 280 Pac. 343.)

For appellant there was a brief over the name of *Messrs. Clark, Skulason & Clark,* with an oral argument by *Mr. B. G. Skulason.*

For respondents there was a brief over the names of *Mr. George Gearhart, Mr. Donald E. Long* and *Mr. William B. Layton,* with an oral argument by *Mr. Allen H. McCurtain.*

ROSSMAN, J.—This is a suit in which the plaintiffs pray for a decree declaring invalid a certificate issued by the chief engineer of the defendant which determined the several quantities of materials excavated by them under a contract with the defendant, and also pray the court to adjudicate the amount due them for their work. The complaint alleges a contract wherein the plaintiffs undertook to construct the right of way for a logging railroad. All materials removed were to be classified by the chief engineer of the defendant as earth, medium or solid rock, and were to be paid for respectively as follows: Forty cents, sixty cents and $1.10 per cubic yard. The complaint alleges that the plaintiffs excavated 15,234 yards of earth, 32,983 yards of medium, and 27,618 yards of solid rock, but that the engineer allowed them 60,039 yards of earth, 15,447 yards of medium,

and 349 yards of solid rock. Their charges of misclassification are accompanied with averments of fraud and of gross mistake. The answer denies all allegations which were intended to impeach the engineer's certificate, and, avers that his classifications were correct. The decree of the Circuit Court allowed the plaintiffs a judgment for $18,094.18 above all sums previously paid them; this award was less than the plaintiffs sought. The defendant appealed and thereupon plaintiffs prosecuted a cross-appeal. The testimony is transcribed upon 1,100 pages, in addition to which there are numerous exhibits, including a large quantity of photographs of the various cuts introduced to assist the court in understanding the type of material covered by the contract. An extended statement of our review of this vast quantity of evidence is manifestly impossible if this decision is to be confined within reasonable bounds; the following will therefore have to suffice. The excavation was carried on near Keasey in Columbia County, in the coast range of mountains. It was preceded by the execution of a contract, which in addition to fixing the prices to be paid for the materials excavated, defined "solid rock," "medium" and "earth" as follows:

"Solid rock shall comprise rock in solid beds or masses in its original position and boulders or detached rock measuring one cubic yard or over, and shall include quartz, limestones, sandstones which do not disintegrate upon exposure, conglomerate when thoroughly compacted and cemented, slate, granite, trap, basalt and similar rocks.

"Medium shall comprise detached masses of rock or stone of not less than one cubic foot or more than one cubic yard, cemented gravel, hard-pan, shale, soapstone or similar material which can be removed

by pick and bar without blasting, although blasting and steam shovel may be used in order to facilitate the work.

"Earth shall comprise loam, mold, gravel, sand and all other materials of whatever nature which do not come under the classification of 'Solid Rock' or 'Medium.'"

The contract conferred broad powers upon the chief engineer of the defendant; it provided that all controversies which might arise between the contractors and the company under the contract should be subject to his decision "and his decision shall be final and conclusive upon both parties." It provided that the said official should on the first day of each month, make an estimate of the value of the work up to that time, and that upon the completion of the work he should issue his final certificate, whereupon the entire balance found due to the contractor should be payable within fifteen days' time. The final certificate determined that the plaintiffs had moved 57,749.53 yards of earth, 14,775.36 yards of medium and 931.77 yards of solid rock. There is no contention that the gross quantity moved was miscalculated; upon the other hand all the witnesses, both for the plaintiffs and for the defendant, accepted that quantity as correctly estimated. Likewise the evidence seems to indicate that the engineer's general plans were skillfully prepared. He was almost constantly in attendance upon the work, and when absent temporarily, substituted in his stead an assistant with whose ability the plaintiffs found no fault. The work done covered thirty-three cuts of varying sizes and depths. Apparently it was difficult to determine accurately the quantities of the three materials, due to the fact that in practically all of the cuts there was no well-defined line of demarcation between earth

and medium, and between the latter and the alleged rock formations. In all except one or two cuts the surface material gradually blended itself into medium, and the latter, as the lower levels were reached, eventually became sufficiently hard so that some of the witnesses contended it was rock in some of the cuts. Adding further to the difficulties of classification was the fact that materials were encountered which were not specifically named in the above definitions.

■ The materials found in the cuts we shall now undertake to describe briefly. There was a top soil of a depth varying from two to several feet which gradually merged into a more difficult substance. Most of the witnesses were uncertain as to the geographical name of the latter, but a geologist, who testified on behalf of the plaintiffs, referred to much of it as a soft sandstone formation, or shale. In some of the cuts he found a combination of the two, which he described as "sandy shale," or "shaley sandstone." It is agreed that this material as it was encountered directly under the top soil was but slightly indurated. Apparently the moisture seeping down from above, carrying with it chemicals yielded by decomposing vegetation, had in the course of time softened this material to the point where it could be quite readily removed. After the excavation had proceeded deeper, this substance in the major cuts became harder until a point was reached where some of the plaintiffs' witnesses felt justified in calling it rock. They were not certain whether it was a sandstone in process of formation or in process of decomposition. They readily testified that even the hardest portions of it were not sufficiently indurated to return fire when struck sharply with a pick. These witnesses were reluctant to apply to this material the

word "rock" geographically, but felt that if an engineer's powder test were applicable these sandstone formations should be considered equivalent to solid rock. This substance soon disintegrated upon removal and exposure to the weather. In fact most of the witnesses could not recall seeing any large pieces in the fills when they made their examinations and calculations; others testified that it soon disintegrated into a pile of sand.

In four of the cuts additional substances were encountered. In the one, plaintiffs' geologist described the material as blue shale, while Mr. Bollons, the engineer for the defendant, described it as "a compressed sea mud," and added that it was "full of clam shells and fossils of different kinds"; another witness believed it was soapstone. Whatever may have been its nature the evidence justifies the conclusion that it presented serious difficulties towards removal. In the second of these four cuts there was a substance which the aforementioned geologist called a "softened tuff" and a layman described as "clay and sand" somewhat resembling gumbo; this substance was also difficult of removal. In the other two cuts the material was an agglomerate.

The material which forms the basis for the principal dispute between the parties was the formation found in natural beds and masses which we shall refer to generally as sandstone. None of it was sufficiently hard to be capable of use as ballast for the railroad. In many of the cuts the finishing crew was able to plow it with a two-horse team. Mr. Bollons classified most of it as "medium," and his act in so doing is challenged by the plaintiffs. They contend that it should have been considered as solid rock. It will be observed that the solid rock definition men-

tioned several hard rocks and "sandstones which do not disintegrate upon exposure." The contractors contend that the qualifying words designated sandstones which decompose so promptly upon exposure that the disintegration facilitates removal; the defendant submits that these words are descriptive, and are intended to distinguish the sandstones found in the coast mountains, which are so firm that they remain intact indefinitely and are usable as building stones, from the type encountered in this project which disintegrates shortly and is therefore soft and more easily removable. It is agreed that no rock was encountered which decomposed at once, and no witness described a rock, found in the coast range, which possessed that quality. We have carefully read and considered all of the evidence in this case and are convinced that the explanation suggested by the defendants is the one intended by the specifications. The above being our conclusion, we find no error in the act of the defendant's engineer which classified those sandstones as "medium." Perhaps it should be added that Mr. Bollons, in keeping with what one of the engineer-witnesses called a practice of doing equity, classified some of this sandstone as solid rock; this accounts in part for the fact that the plaintiffs are credited with the removal of 931.77 cubic yards of solid rock, although nothing was encountered in the prosecution of the work which would be commonly called by that name.

We come now to those cuts in which the tuff, agglomerate and blue sandy shale were encountered. The definitions of solid rock, medium and earth do not specifically mention these substances. Apparently the contract's draftsman was not aware that those materials were present and hence did not mention and

classify them. The sold rock definition includes various hard rocks such as "slate, granite, trap, basalt and similar rocks"; the three latter words suggest that the draftsman anticipated that other rocks might possibly be encountered, and his use of the word "similar" makes it evident that he did not intend that they should be included in the solid rock classification unless they possessed attributes akin to those of granite, trap, basalt, etc. We pass now to the definition of medium. It likewise mentions specific materials; for instance "detached masses of rock or stone," of not less than, and not more than a prescribed size, "cemented gravel, hard pan, shale, soapstone or similar material"; those words are followed with a test, which the witnesses agree is well known to contractors and engineers, thus "which can be removed by pick and bar without blasting, although blasting and steam shovel may be used in order to facilitate the work." The foregoing would seem to warrant the inference that the parties in employing those words, intended that medium should include substances of the specified type "or similar material" provided it could be removed by pick and bar. The tuff and blue sandy shale presented serious difficulties to the pick and bar; they required powder. A pick readily penetrated them, but failed to shatter the material so as to prepare it for the shovel; apparently these materials could be handled easier than rock on account of their lighter weight. To the earth classification the contract assigned overlying substances, "and all other materials of whatever nature which do not come under the classification of solid rock or medium." When the tuff, agglomerate and blue sandy shale were encountered Bollons was required to classify them. The plaintiffs claim that when he

failed to deal with the tuff and the blue sandy shale as solid rock he erred. Those materials were sticky and clay-like, or, to borrow the words of the trial judge, 'rubbery, gummy sort of stuff.'' Upon becoming wet the blue shale became sufficiently soggy so that the horses could not operate in it and the work had to be suspended. Due to its soft, muddy nature ti became necessary to abandon laying ties in it until dry weather came. In this cut Bollons credited the plaintiffs with 1,932 yards of earth; he classified the blue shale as 2,377 yards of medium, and 368 yards of solid rock. He explained the latter item as an effort to allow the plaintiffs additional compensation for the difficulties of removal. The engineers, who testified on behalf of the plaintiffs, found a materially less amount of overburden of earth; one of them found 1,443 yards of medium, another 2,405 yards, and a third 1,539 yards. Next they concluded that any substance which required blasting for removal in commercial quantities was rock, and hence the three found the following quantities of rock in this cut, 2,885 yards, 1,923 yards and 2,260 yards. Mr. J. P. Newell, an engineer of recognized ability, classified this cut as 1,662 yards of earth, 2,110 yards of medium and 905 yards of solid rock; he explained his classification as follows:

''The top of that cut has six feet of earth over it; about 40% of the remainder is a volcanic ash, hard enough to be called medium. The balance is a blue shaley material, not hard rock, but tough, rubbery stuff, costing nearly as much to take out as rock. It takes lots of powder to break it. Is not really solid rock, but not unfair to call it half solid rock. Two veins of hard sandstone a foot thick and some extra boulders, the blue material disintegrates into particles under an inch after a few months. That was

found by examination of the fill. In that cut, therefore, I calculated in the cross sections what there would be left of the cut after taking off the six foot of earth and I took 40% of it as being all medium and the remaining 60% as being half medium and half solid rock. That is a recognition of the hardness of the material to remove.''

All of the witnesses rejected the suggestion that these materials should be relegated to the classification of earth on account of the general residuary clause. The method of award applied by Mr. Newell and Mr. Bollons was evidently founded upon the principle that substances encountered, but not classified in the contract, were to be compensated for in proportion as the difficulty of their removal bore to the materials expressly mentioned and classified. To us it seems that the plaintiffs' three witnesses recognized the same principle for they constantly referred to the difficulty of removal as being the superior test of classification. The difference in award between the defendant's four witnesses and the plaintiffs' three lay in the fact that the latter felt compelled to place the unclassified substances definitely in one of the three classifications, whereas the defendant's witnesses felt at liberty to apply the test of difficulty of removal in a more equitable manner by refraining from actual classification but allowing just compensation. We have already mentioned Mr. Bollons' and Mr. Newell's award for this substance; a third engineer of recognized merit, who testified for the defendants, classified this material under the same principle but arrived at a result less remunerative to the plaintiffs, while a fourth allowed the plaintiffs the same amount of earth classification, as was awarded by Bollons, and 2,636 yards of medium, but no rock. The difference

in the financial award between the classifications of Bollons and Newell is $322. We know of no reason that demanded that these substances should be forced into any one of the three classifications.

We understand that Mr. Bollons employed the same method of award in the other cuts where unclassified materials were encountered; that is, he compared their difficulty of removal with materials that were mentioned and allowed an award proportionately. Thus he credited the plaintiffs with sold rock in five cuts, although he felt that no substance in appreciable quantities was anywhere present that the specifications classified as solid rock. The three other engineers, who testified for the defendant, were of like opinion. Mr. Newell allowed 1.510 yards of rock; Mr. O'Neel, another of the defendant's witnesses, allowed 779 yards of rock, while Mr. Bell, the fourth of the defendant's witnesses, allowed 1,893.52 yards of rock. The plaintiffs' witnesses upon the other hand found much more solid rock, due to the following reasons: (1) unless the sandstone disintegrated so as to facilitate removal they regarded it as solid rock; (2) unclassified materials, which required blasting, they regarded similarly. For these reasons Mr. Griswold, one of plaintiffs' witness-engineers, found 27,089 cubic yards of rock, while Mr. Kelley, another, found 20,397 yards of the same material. To us it seems that those witnesses erred when they applied only the powder test and disregarded the descriptive terms mentioned in the specifications. We are of opinion that the latter prescribe as tests for the rock classification not only the powder test, but also the enumerated rocks "and similar rocks." Since the blue shaly material and the tuff were not rock, nor as difficult of removal as rock, we conclude that the method of

classifying them suggested by the defendant's witnesses, was the one which best conformed to the specifications and contract.

When, on account of the above conclusions, deductions are made from the rock awards of plaintiffs' witnesses, their amounts will be materially lessened. But, they must be still further reduced by reason of the following facts. (1) Plaintiffs' engineers found rock in several cuts where the plaintiffs claimed none during the progress of the work and where they practically acquiesced in Bollons' award; (2) one or more of them found rock in five cuts where the plaintiffs' powder report fails to show that any blasting was done. (3) In at least two cuts, where a negligible quantity of powder was used, these witnesses found very considerable quantities of rock. The evidence indicates that at least a half pound of powder was required to move a yard of rock. In cut nine, for instance, where only twenty-five pounds of powder was used one of these witnesses found 531 yards of rock.

The evidence suggests, perhaps, that Mr. Bollons was conservative in his classifications; yet his award is only slightly different from the three other engineers who testified on behalf of the defendant. No other engineer, who testified, was present at all times during the progress of the work, and invested with the responsibility of making an award; these qualifying circumstances, we believe, lend weight to Mr. Bollons' certificate. We find nothing, as we shall explain later, that discredits his ability; no evidence was introduced in an effort to show that he was actuated by improper motives. It does not appear that any calculation he made was erroneous, unless we should feel that he miscalculated the proportionate quantities of materials. We would have no hesitancy

in rendering a finding for the defendant were it not for the fact that the able judge of the Circuit Court, who tried this suit, set aside the engineer's certificate and granted relief in an amount materially larger than the award. Out of deserved respect for the decree of a trial judge who displays an intelligent and keen interest in the presentation of the evidence we would have appreciated an opportunity to compare our findings with his, but the record is silent as to how the lower court came to its result.

Our previous review of the evidence has disposed of the rock controversy; but, there yet remains a considerable difference between the medium classification, suggested by the contractor's engineer-witnesses, and Bollons' certificate. It may be that the court below felt that Bollons erroneously classified this material; yet it is clear that plaintiffs' witnesses found too much of this material for they awarded the plaintiffs quantities in cuts where the latter claimed none. Medium, being in the middle, presented almost as much difficulty of precise classification as man's middle life.

■ Before disposing finally of the plaintiffs' contentions it may be well to review once more the principles of law that lend finality to an engineer's certificate, and to determine under what circumstances such an award will be vacated if the engineer made a mistake. At the outset it may be well to remind ourselves that parties frequently are persuaded to include in contracts of this kind a provision for adjudication of their disputes by the skilled, practical engineer, who supervises the operations, under the belief that the quick inexpensive result reached by him will better serve their purposes than an award made by a lawyer-judge, who is possessed of no personal knowledge of the work and is compelled to

resort to witnesses, whose memories have become somewhat dimmed, and to experts, who frequently are as partisan as the attorneys. But be that as it may, the parties to this suit expressed their preference, and under the laws of this state they were free to make a choice between those two methods of adjudication: *Elliott Contracting Co.* v. *Portland,* 88 Or. 150 (171 Pac. 760). In *Elliott* v. *Missouri etc. R. Co.,* 74 Fed. 707, it is said: "There is no moral law, and no rule of public policy, which forbids parties to submit to another for determination or decision questions of count, measurement of distance, although these questions may be capable of accurate ascertainment." This court has repeatedly recognized the rights of contracting parties to include such a provision in their contracts. Indeed a provision of the type inserted in this contract is buttressed upon a circumstance which lends significance to it superior to the ordinary engagement for submission to arbitration. We quote the following from *Sweet* v. *Morrison,* 116 N. Y. 19 (22 N. E. 276, 15 Am. St. Rep. 376):

"In one sense as was said in a case somewhat analogous, the submission to the determination of the engineer is more obligatory than any ordinary submission to arbitration, inasmuch as being upon consideration, it is not revocable, and the obligation upon the defendants to pay did not, by the terms of the contract, arise until the estimate was made by the engineer."

To the same effect, see *Williams* v. *Chicago etc. Ry. Co.,* 112 Mo. 463 (20 S. W. 631, 34 Am. St. Rep. 403). Provisions of the kind now before us, we are told in the case last cited, had their origin in contracts for the building of important and extensive government

works and were designed to avoid harassing litigation over questions that could only be determined efficiently by those possessed of scientific knowledge. The presumptions are in favor of the award: *Oregon-Washington etc. Co.* v. *Spokane etc. Ry. Co.*, 83 Or. 528 (163 Pac. 600, 989, Ann. Cas. 1918C, 991). This principle has been expressly recognized in awards by arbitrators, and it is held that the burden is upon the party seeking to impeach the award to sustain his charge with clear and convincing proof: *Cooper* v. *Pennick*, 102 Or. 382 (202 Pac. 743). There is, however, the circumstance that in construction cases the engineer, invested with arbitration powers, is generally in the employ of one of the contracting parties. This circumstance, however, should not cause the courts to ignore or distort the plain language of the contract. A judge must have no affiliations with either party, because our system of jurisprudence contemplates a disinterested judicial officer. But, as was well pointed out in the much cited case of *Range* v. *Great Western R. R. Co.*, 5 H. L. Cas. 88, a contractor who enters into a stipulation of this kind is fully aware of the engineer's employment, and realizes that the award will really be that of the employer. See, also, *Williams* v. *Chicago etc. Ry. Co.*, *supra.* Courts do not hasten to relieve vendors from full performance of their contracts even when they agree to furnish a title, or supply an article of merchandise that will satisfy the vendee. Hence we have a stipulation which is valid and binding and considering the present favorable attitude towards arbitration, as is evidenced for instance by 1925 Session Laws, Chapter 186, a stipulation of the kind now before us would seem to be in harmony with the trend of public policy.

■ It remains only to consider whether we would be justified in disregarding Bollons' certificate if the evidence warrants a finding that he made errors of judgment, and thus miscalculated the quantity of medium. We shall refer briefly again to the record. There is no evidence of fraud upon the part of the defendant, or its engineer; we therefore dismiss that charge. There is no evidence that Bollons was incompetent except a doubtful inference which the plaintiff invites us to draw from a portion of the evidence concerning the manner in which he classified the materials. But this evidence to which they point is wrested from its proper setting; when all of it is considered the conclusion is warranted that Bollons classified the materials in the same manner as the other engineers. We deem it proper to assign importance to the fact that when Bollons realized that the plaintiffs were dissatisfied with his awards he called to his assistance two experienced engineers of good repute and had them review his classifications. His act in so doing, we believe, negatives any imputation that he was arbitrary or actuated by any motives which would impel him to be unfair. They became two of the· four witnesses for the defendant. No question has been suggested as to the professional standing of Bollons. We, therefore, reject as unwarranted the charges of incompetency, dishonesty and arbitrary conduct.

It is to be observed that almost every court which has defined the kind of mistake which will justify an impeachment of the engineers' award has spoken of "a palpable mistake," "a mistake so clear that it implies bad faith," "evident mistake," "a clearly proven mistake," "a failure to exercise an honest judgment," "arbitrary action" etc. This court has not only employed language to like effect, but has

never disregarded an engineer's certificate on account of a mistake unless the latter was of the above type. Thus in *Sweeney* v. *Jackson County,* 93 Or. 96 (178 Pac. 365, 182 Pac. 380), this court held "if the error was so gross as to amount to a showing that it is not an honest judgment" the award by the engineer will be disregarded. In that case the contract's stipulation for a determination of quantities and classifications by the state highway engineer practically failed to function because the engineer's staff was inadequate to discharge the numerous duties assigned to that office by the highway construction program which the state and counties were pursuing. As a result the classifications did not express the highway engineer's judgment. Numerous errors were revealed and the certificate was disregarded. In *Baker* v. *Multnomah Co.,* 118 Or. 143 (246 Pac. 352), the contractors undertook to construct a road 9,600 feet in length which the county roadmaster, for his purposes, divided into segments. In 35 per cent of these segments the latter's assistants made errors totaling 8,037 cubic yards; in one segment alone the error aggregated $1,176. The plaintiff claimed other vital errors in regard to classification. This court held "we do not find that the testimony is balanced. It overwhelmingly overcomes the final award of the road master and shows that the final certificate is erroneous both in computation and classification, is not in accordance with the specifications made a part of the contract and should be set aside and a new finding made." In *North Pacific Const. Co.* v. *Wallowa Co.,* 119 Or. 565 (249 Pac. 1100), the engineer had estimated the cost of the improvement at $28,000, but in the prosecution of the work a larger amount of rock was encountered than he had anticipated. The plaintiffs charged that

in order to bring the cost of the work within his estimate he closed his eyes to the real facts and classified much rock as common. The decision states:

"In making up his estimate, he was strongly influenced by that conception, with the result that he classified the excavation as 'common' to an unwarranted extent in order to pay for the same at the cheapest rates."

In *Oregon-Washington etc. Co.* v. *Spokane etc. R. Co., supra,* this court observed that "An award will be set aside for mistake of fact so gross as to evidence partiality upon the part of the arbitrators." See, also, *Gerdetz* v. *Central Or. Irr. Co.,* 83 Or. 576 (163 Pac. 980). From an exhaustive footnote in 10 Ann. Cas. 580, we quote:

"In one important respect the decision of an architect or engineer is to be treated precisely like an award under a submission to arbitration; it cannot be impeached for mistake arising from an error of judgment on the part of the architect or engineer. *Wood* v. *Chicago etc. R. Co.,* 39 Fed. 52, citing *Ranger* v. *Great Western R. Co.,* 13 Sim. 368 (1 R. & Can. Cas. 1); *Snell* v. *Brown,* 71 Ill. 133; *Palmer* v. *Clark,* 106 Mass. 373; *Ortman* v. *Green,* 26 Mich. 209. Nor can the decision be impeached for error in drawing conclusions from evidence and observation: *Palmer* v. *Clark,* 106 Mass. 373. 'To avoid it, the mistake must be one which shows that he was misled, and so far misapprehended the case that he failed to exercise his judgment upon it; as where he is imposed upon by false measures or false weights, or there is obvious error in figures.' *Palmer* v. *Clark,* 106 Mass. 373." (We have read the cases cited and they warrant the text.)

We quote the following from Williston on Contracts, Section 797:

" * * If the architect or engineer arrived at his conclusion under a clear mistake as to material facts, relief seems proper; but where his knowledge of the facts of the case is adequate, though his judgment may be unreasonable, it is a total change of the terms of the contract for the court to permit the judgment of a jury to be substituted for that of the architect or engineer for which the contract provided. To allow recovery on the contract wherever a jury finds the architect or engineer has been unreasonable, is doing nothing less than this. Equity has certainly never given relief from harsh contracts on any such broad basis."

The following from *Williams* v. *Chicago etc. Ry. Co., supra,* is helpful:

"The engineer's measurement, in the absence of fraud, or such gross mistake as necessarily to imply bad faith is binding and conclusive, and his classification of material, where it is left to his judgment, is final and conclusive in the absence of fraud, but under a proper construction of this contract, the parties had not submitted to him the question of how hardpan was to be classified. They fixed that for themselves. It is the province of the court to construe contracts, and the plaintiffs had a right to the construction of the court on this clause: *King Iron Bridge etc. Co.* v. *St. Louis,* 43 Fed. 768; [10 L. R. A. 826]; *Lewis* v. *Chicago etc. Ry. Co.,* 49 Fed. 708.

"That there will be great diversity of opinion as to what is hardpan, we think is highly probable, but the parties to this contract assumed it was well known. It was the province of the engineer to say what was hardpan, and how much hardpan there was excavated, but he was bound to classify hardpan as loose rock, and had no right to decline to so grade it, because it could be moved with a ten-inch plow and six mule team. Of course, if it shall appear on the trial that the engineer did not misconstrue the contract in this respect, then his measurements are binding and con-

clusive, in this as well as in other respects, until impeached for fraud.''

After a careful reading of the testimony we are satisfied that Mr. Bollons recognized medium as it is defined in the specifications, and properly classified it. Possibly he was not liberal with the plaintiffs, and may not have resolved many doubts in their favor, but we are convinced that the evidence warrants no conclusion of gross error. When the parties subscribed their signatures to the contract they agreed to abide the consequences of any honest mistake made by the engineer that was not gross. He has made his award, and since we find that all of the charges with which they assail it are devoid of merit it follows that their attack must fail and that their rights must be determined upon the basis of the engineer's findings. The cause will be remanded with instructions to enter a decree in conformity with the above. Costs to neither party. REVERSED.

McBRIDE and RAND, JJ., concur.

BROWN, J., did not participate in this opinion.

---

Rehearing denied September 17, 1929.

ON PETITION FOR REHEARING.

(280 Pac. 343.)

For the petition, *Mr. Allen H. McCurtain, Mr. George Gearhart, Mr. Donald E. Long* and *Mr. William B. Layton.*

*Contra, Messrs. Clark, Skulason & Clark.*

ROSSMAN, J.—The petition for rehearing is accompanied with an extensive brief which argues that our decision erred when it upheld the classifications of materials made by Mr. Bollons, the supervising engineer. The brief confines itself almost exclusively to questions of fact and selects as the principal subject matter of argument the sandstone formations. Since the plaintiff, in a comprehensive brief, has once more argued the classification of the sandstone formation, we have again carefully reviewed the entire matter. The arguments pressed upon us are not of a new type and hence we deem it unnecessary to set forth our views at length. The following will have to suffice.

It will be recalled that the contract defines solid rock, medium and earth by prescribing practical geological definitions and accompanying these with two tests well understood by contractors and engineers; the powder test and the pick and bar test. It will also be recalled that the parties did not entrust the classification of materials solely to these definitions and tests, but agreed upon something more specific in regard to some materials which they anticipated might be encountered; that is believing that quartz, limestone, gravel, hard-pan, sandstone, etc., might be met they did not leave the classification of these materials to determination by the application of the geological definition, nor to the powder and pick and bar tests, but agreed that gravel should be classified as earth, quartz as solid rock, hard-pan as medium and sandstone as solid rock, when the latter's structure was of such a character that it did not disintegrate upon exposure.

It will be remembered that the only sandstone which was encountered disintegrated so soon after its removal that when the work was viewed by the engineer-witnesses two or three months after the completion of the cuts no large pieces were found in the fills; in fact practically all had disintegrated into sand or mud. The opening paragraph of the brief, which accompanies the petition for rehearing, contains the frank admission that most of this material "disintegrated into sand and mud within a few weeks or months after its removal." A piece of the material is before us which was taken from the bottom of the deepest of the cuts; when it was offered in evidence by the defendant, counsel for the plaintiffs apparently was astonished that the former had been able to preserve it until the day of the trial; he thus expressed himself: "If I had thought that I could find one that would stay up that long I would have brought one myself." Counsel for the defendant thereupon explained: "We kept it dry or it would not be here." We notice that when a portion of it is subjected to moisture it quickly melts and disintegrates into a muddy sand. It is this substance which the plaintiffs ask should be classified as solid rock; before we would be warranted in yielding to this argument we must be prepared to find that this substance is not a sandstone which disintegrates upon exposure.

The plaintiff's argument contends that we have overlooked the words "and similar rocks" which conclude the solid rock definition, and that we have failed to assign to the powder test and to the pick and bar test sufficient importance. The plaintiffs argue that these soft sandstone formations are included within the solid rock classifications through the use of the above words "and similar rocks." It seems clear

that no sandstone could be similar to one which does not disintegrate upon exposure unless it is sufficiently indurated to retain its structure and texture upon exposure. Since all sandstone encountered in the progress of this work crumbled, melted or otherwise disintegrated, we do not believe that the words "and similar rocks" bring this material into the solid rock classification.

■ Next, the plaintiffs contend that since these sandstone formations could not be removed expeditiously with pick and bar, but required powder, they must be classified as solid rock. Our previous decision sets forth our views upon this contention, but we shall add the following. The pick and bar test and the powder test are general in character when confronted with words as specific as "quartz," "limestone," "hardpan," "sandstones which do not disintegrate upon exposure"; in other words the parties have specifically classified these expressly named substances and have left for classification by test and definition, only substances which they could not classify beforehand. These tests and definitions were not intended to override and reclassify substances named in the contract and expressly classified. It is a general rule of construction that the specific words prevail over general ones and that the latter must yield to the former. It therefore seems clear from the terms of the contract that only sandstones which do not disintegrate upon exposure are to be classified as solid rock.

It follows from the foregoing that the petition for rehearing must be denied.  REHEARING DENIED.