Argued September 7, 1973, reversed in part, affirmed in part,
and remanded August 1, 1974

KRIEG, *Respondent, Cross-Appellant, v.* UNION
PACIFIC LAND RESOURCES CORPORATION,
*Respondent,* COLHOUER, *Appellant,*
*Cross-Respondent.*

525 P2d 48

*Ferris F. Boothe,* Portland, argued the cause for appellant, cross-respondent J. C. Colhouer, dba Colhouer Construction Company. With him on the briefs were Douglas G. Beckman and Black, Kendall, Tremaine, Boothe & Higgins.

*Frank H. Lagesen,* Portland, argued the cause for respondent Union Pacific Land Resources Corporation. On the brief were Cosgrave & Kester.

*Alan K. Brickley,* Portland, argued the cause for respondent, cross-appellant William E. Krieg, dba Krieg Construction Company. On the brief were Davis, Jensen, DeFrancq & Holmes.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, TONGUE, HOWELL and BRYSON, Justices.

McALLISTER, J.

This is a suit to foreclose a mechanic's lien on a city block in downtown Portland bounded by Washington and Alder Streets and Ninth and Tenth Avenues, known as Block 216, owned by the defendant Union Pacific Land Resources Corporation, hereinafter referred to as "U.P."

On May 17, 1971, U.P. contracted with the defendant J. C. Colhouer to demolish and dispose of the buildings on three-fourths of Block 216 and to construct on the cleared land a surface automobile parking facility.

Colhouer, in turn, on June 21, 1971, subcontracted with the plaintiff William E. Krieg that Colhouer

would wreck and remove the buildings, cap the sewers, remove the sidewalks, fill the basements up to one-tenth of grade and that Krieg would "furnish all labor, material and equipment necessary to complete all rocking, asphalt paving, stop blocks, waterlines, catch basins, all concrete and shrub plantings" and "all other work required * * * to complete the parking lot" according to U.P.'s plans and specifications.

The primary question is whether certain paving in the streets surrounding Block 216, required by the city of Portland, was a part of the work required by the U.P.-Colhouer contract or was extra work to be paid for by U.P. If Colhouer was responsible for the street paving under the contract the next question is whether Krieg was responsible for this item under his subcontract with Colhouer. In addition, there is a dispute between Colhouer and Krieg as to (1) the amount due Krieg for additional asphalt required to pave the parking lot, (2) whether Colhouer owes Krieg for other alleged extras, and (3) who was responsible for the cost of the permit for the sidewalk and curb work. Krieg also claimed interest on the amount due him from Colhouer.[1]

We turn first to the street paving. It is clear that when their contract and subcontract were entered into none of the parties anticipated that any street paving would be required in connection with the construction of this parking lot. As a part of the demolition and removal of the buildings the old sidewalks and curbs were removed. For some reason which is not disclosed

---

[1] U.P. asserted claims against Colhouer for damages for delay in completing the contract and for indemnity from Colhouer 'for any amounts which it has to pay Krieg or his subcontractors in excess of the contract price. These claims are not involved in this appeal.

by the record, the city set the grade for the new curbs substantially higher than the grade for the former curbs. The city required that the street paving be no more than seven inches lower than the new curbs. To accomplish this, the city required that additional asphalt be laid from the curbs out into the street and joined with the existing paving by a process called "feathering." This is the street paving called "skin patching" about which the parties are in dispute.

Mr. Donald F. Sheely, an engineer employed by U.P., was in charge of this project for U.P. In early August 1971, Sheely first learned that the city was going to require street paving in connection with the construction of the parking lot. He thereupon wrote the following letter to the City Engineer:

"August 16, 1971

1150-304 F

Mr. James Apperson
City Engineer
City of Portland
1800 S.W. Sixth Avenue
Portland, Oregon 97201

Dear Mr. Apperson:

This is in regard to Block 216, located in Southwest Portland, and its interim use as a surface automobile parking facility.

It was recently brought to our attention that it is the property owners obligation to build up the street areas adjacent to their property at such time as a permanent structure is located thereon.

This will confirm that at such time as a permanent structure is located on its Block 216 property that the Union Pacific Land Resources Corp-

oration will take care of the above mentioned obligations.

Yours very truly,

s/ O. W. RYAN
Director-Land &
Industrial Development

By: D. F. SHEELY
Engineer "

It will be noted that the letter was, in effect, an acknowledgment by U.P. that, as the property owner, the street paving was its responsibility. According to Sheely, the city did not respond to this letter. After the city appeared to have declined, sub silentio, U.P.'s offer, Sheely took the position that Colhouer was obligated under his contract to perform the street paving.

On August 24th Krieg signed an application for a permit to construct the curbs, sidewalks and gutters, which described the work as: "Replacing combination sidewalk and curb to new grades, skinpatching if necessary", and issued his check in payment of the permit fee. The permit fee of $240 was calculated only on the area of the sidewalks, curbs and driveways with no charge for skin patching. He testified that he applied for the permit even though he did not think it was his responsibility because he was ready to pour the sidewalks and the city would not come out and set the grade until the permit was issued.

On August 26th Sheely, who testifed that he was concerned over delay in the sidewalk construction and was unaware that Krieg had already taken care of the permit, accompanied Colhouer to City Hall, where Colhouer signed a permit application. This application was practically identical with Krieg's except that the work was described as: "Replacing sidewalk and curb

to new grade, and paving roadway if necessary." Krieg testified that when he learned, on that same day, that Colhouer and Sheely had obtained a new permit he immediately stopped payment on his check.

The contract provided that the work had to be completed by September 21, 1971. Sheely apparently did not inform either Colhouer or Krieg that the city would require that the streets be built up. It is not clear from the record precisely when Krieg learned of the skin patching requirement or the extent thereof. Colhouer testified that he first learned of it around September 8th or 10th. Both men consistently denied any responsibility for the street paving, but Colhouer insisted that if the street paving was not extra work, then Krieg was responsible for the work under his sub-contract.

During the last three weeks in September there was an exchange of correspondence between the parties, including an offer by Colhouer to U.P. and Krieg to submit the dispute to arbitration. This offer was refused by U.P. and was apparently ignored by Krieg. Although all the work on the parking lot except the street paving was completed by the September 21st completion date, the city would not issue a certificate of acceptance until the paving was done. Since Colhouer could not get paid by U.P. until he furnished a certificate of acceptance he wrote letters on September 30th to U.P. and Krieg informing them that he was proceeding with the paving, but that he intended to hold them liable for the cost. Colhouer then ordered the paving done by the city at a cost of $1,040.

In contending that Colhouer was obligated by his contract to do the street paving, U.P. relies on several provisions of its agreement with Colhouer and the

specifications attached thereto. Those were general provisions requiring the work to be done in compliance with the city code and requiring the contractor to furnish U.P. evidence that the city "has accepted the portion of the work over which it has jurisdiction", and the following provisions of the specifications concerning the scope of the work:

"*SECTION III—MATERIALS AND METHODS*
"*Scope of Work*:
"(B)  Miscellaneous Work: The following items of work will be classed as miscellaneous work:
\* \* \*

"2)  Concrete Sidewalks, Driveways, and Curbs
\* \* \*

"All earth work, including subgrade preparation, along with all associated work required in connection with these items of miscellaneous work, shall be considered incidental to the work and have been a consideration in establishing contract amounts.

\* \* \* \* \*

"2)  Concrete Sidewalks, Driveways and Curbs: The scope of work in this section consists of that necessary to construct, or reconstruct, the concrete sidewalks, driveways and curbs in the areas adjacent to the demolition and as indicated on the drawing.

"The concrete sidewalks, driveways and curbs shall be constructed in accordance with the current City of Portland standards and shall be subject to their acceptance.

"Grades will be established by the City of Portland for the sidewalks, driveways and curbs. \* \* \*"

Colhouer argues that neither the contract agreement nor the specifications made any reference to any work to be performed in the street. He also contends that neither party contemplated any street paving at the time the contract was entered into.

As indicated earlier, we agree with his second contention. According to Colhouer, he assumed the city would set the sidewalk grades close to the existing grade and that he "just didn't think" the contract provision requiring city acceptance of sidewalks included the street. Sheely testified that when he first learned of the paving requirement he was surprised at the amount and that it seemed excessive to him.

The question of whether the paving was within the work required by the contract is a closer one. This is not the usual example of "extra work," where the item is something different from and in addition to the work specified by the contract, the doing of which is optional. Here the paving was required by the city as a condition of the cerficate of acceptance, which was necessary in order for Colhouer to get paid. Colhouer had no control over the city's decision to set the new sidewalk grades substantially higher than the old ones. There is nothing in the record to explain why the higher sidewalks were required or how the new paving level was determined. As a practical matter, neither Colhouer nor U.P. had any real choice as to whether or not to do the paving. The work involved an area outside the boundaries of U.P.'s property described in the contract, specifications, and plans.

■■ Based on these considerations we hold that the "skinpatch" paving work was "extra work" under the contract, and that Colhouer is thus entitled to payment for this work in addition to his contract price. We are further persuaded to this conclusion by the fact that when Sheely first learned of the requirement, he attempted to postpone the paving until sometime in the future. He testified that if this postponement had been allowed the cost of the paving, when it was done, would

have been paid by U.P. The conduct of the parties to a contract and their practical interpretation of it is an important factor when there is a dispute over its meaning. *Kontz v. B. P. John Furniture Corp.*, 167 Or 187, 203, 115 P2d 319 (1941). From Sheely's conduct it is clear that at least initially he did not consider the paving to be within the work required of Colhouer under the contract.[2]

U.P. further contends that even if the paving is extra work, Colhouer is bound by Sheely's determination to the contrary. Section 15 of the U.P.-Colhouer agreement states:

"Section 15. EXTRA WORK

"The Company may require the Contractor to perform work which the Engineer may not classify as alterations or changes of or to the work covered by this contract but as work in addition thereto. If the latter, the work shall be classified as extra work and upon written order of the Engineer it shall be paid for at prices to be agreed upon in writing by the Engineer and Contractor before commencement of such extra work. * * * Extra work shall be performed by the Contractor only upon the written order of the Engineer and not otherwise. * * * The Engineer shall determine whether the work done or to be done is extra work within the meaning of this Section or otherwise, and his decision in that regard and with respect to the amount, classification and value of the work shall be binding upon the parties hereto."

---

[2] For cases discussing the determination of "extra work" see: Collins v. Post et al, 227 Or 299, 304, 362 P2d 325 (1961); Wiggins v. Southwood Park Corp., 221 Or 61, 350 P2d 436 (1960); Sweeney v. Jackson County, 93 Or 96, 129, 178 P 365, 182 P 380 (1919); Hayden v. Astoria, 74 Or 525, 532, 145 P 1072 (1915); Chamberlain v. Hibbard, 26 Or 428, 433, 38 P 437 (1894); see, also, 15A Words and Phrases (1950) "Extra Work", pp 701-705 and Pocket Part.

Colhouer concedes that Sheely's decision is binding, unless he acted arbitrarily, dishonestly or under a demonstrable mistake of fact. 17A CJS 414, Contracts § 371 (6). In cases involving the question of the conclusiveness of a decision made under a similar provision we have applied a similar standard. In *Sweeney v. Jackson County,* 93 Or 96, 115, 178 P 365, 182 P 380 (1919) we stated that both parties would be bound "in the absence of fraud or of such gross mistake as would imply bad faith or a failure to exercise honest judgment." In *Friberg v. Elrod,* 136 Or 186, 194-195, 296 P 1061 (1931) the standard was whether the engineer exercised "that degree of care, skill, and good faith in the discharge of his duty, which the law exacts", or whether there was "fraud or * * * such gross mistake as would imply bad faith or a failure to exercise honest judgment."[9]

■■ We are persuaded here that Sheely's decision falls within the area of exceptions to enforcement of the contract provision. The primary purpose of such a provision is to avoid litigation over questions that could only be determined efficiently by those possessed of a particular scientific or technical expertise. *Mayer v. East Side Logging Co.,* 130 Or 341, 354-355, 278 P 957, 280 P 343 (1929). Even where the decision in dispute involves a technical question it has been overturned if the standard of gross error has been met.

---

[9] Other cases applying a similar standard include: State Hwy. Com. v. Heintz Constr., 245 Or 530, 538, 423 P2d 175 (1967); North Pacific Const. Co. v. Wallowa Co., 119 Or 565, 566-567, 249 P 1100 (1926); Johnson v. Prineville, 100 Or 105, 115, 196 P 817 (1921); Hoskins v. Powder Land & Irr. Co., 90 Or 217, 226-227, 176 P 124 (1918); Oregon-Washington R. & N. Co. v. Spokane, Portland & S. Ry. Co., 83 Or 528, 541, 163 P 600, 989 (1917); Leiter v. Dwyer Plumbing Co., 66 Or 474, 480, 133 P 1180 (1913); J. R. Meyers & Co. v. The Pacific Constr. Co., 20 Or 603, 606, 27 P 584 (1891).

E.g., *Baker v. Multnomah County,* 118 Or 143, 246 P 352 (1946). Sheély's decision that the paving was within the contract involved no such technical expertise and was simply a question of construing the contract. His actions in first attempting to postpone the paving and thus shift the liability therefor to U.P. suggests that his subsequent notification to Colhouer that he was responsible under the contract for the work was not reasonably fair, *North Pacific Construction Co. v. Wallowa Co.,* 119 Or 565, 566, 249 P 1100 (1926), nor the result of an exercise of "honest judgment," *Sweeney v. Jackson County,* 93 Or 96, 120, 178 P 365, 182 P 380 (1919). Thus Colhouer's failure to secure written approval for the work from Sheely is no bar to Colhouer's recovery for it as extra work.

The trial court's ruling against Colhouer on this issue is reversed.[⊕]

■ The next question is whether Krieg or Colhouer is responsible for the cost of the permit for the construction of the sidewalks, curbs and driveways. Krieg concedes that he was obligated to procure permits for the work he had agreed to do under his subcontract with Colhouer. Since the fee charged for the permit was calculated only on the amount of sidewalks, curbs and driveways to be constructed, all of which Krieg had contracted to construct, we find he was clearly liable for the fee for this permit.

The next dispute concerns the amount claimed by Krieg for extra asphalt. Because for various reasons the fill (the "subgrade") in large parts of the

---

[⊕] Since we hold that the "skinpatch" paving was extra work and not within that specified in the contract, we do not reach the question of responsibility for it as between Colhouer and Krieg.

parking lot area was unstable, Krieg decided that he would have to lay down more asphalt than the two inches required by the specifications. Colhouer, in a letter to Krieg, first agreed to pay for extra rock necessary to stabilize the fill, since "Colhouer Construction Co. is responsible for sub-grade compaction." However, Colhouer testified that he put in the extra rock himself. At any rate, five days later, on September 14th Colhouer signed an agreement obligating him to "pay for any and all overages of asphalt." The claimed "extra" is for 112 tons of asphalt at a cost of $1,097. Colhouer contends that this amount is excessive and that an allowance for 40 tons would be reasonable. Colhouer contends that the extra asphalt was needed only in a 20 by 80 foot area.

■■ The trial court allowed recovery for this item. We affirm. There is a factual dispute as to whether the September 14th agreement of Colhouer to pay for "any and all" overages of asphalt was understood by the parties to apply only to a 20 by 80 foot area. Resolution of this dispute turns on the credibility of the witnesses, and although review here is *de novo* this court has frequently stated that it gives great weight to trial court findings which depend on evaluations of witnesses' credibility. In addition, under the Colhouer-Krieg subcontract Colhouer was obligated to fill "the basements". According to his own testimony the basements covered about 75 per cent of the area to be paved, an area considerably larger than 20 by 80 feet.

Krieg also claimed that Colhouer should reimburse him for soil tests which Krieg had made of the subgrade fill. Before starting the paving work, Krieg became concerned over the apparent instability of the fill placed by Colhouer and ordered two different soil

tests, at a total cost of $457. Krieg contends these tests were necessary for him to properly fill his contractual obligation and thus the cost is an allowable "extra". Colhouer contends that the tests were made more for insurance purposes in case the work did not hold up for the one year it was to be guaranteed.

■■ Generally, no recovery can be had for extra work or materials unless performed or supplied with the knowledge and consent of the party to be held liable. *Coryell v. Bluett,* 251 Wis 458, 29 NW2d 741 (1947); *J. L. Carpenter Co. v. Richardson,* 118 Conn 322, 172 A 226 (1934). The tests were not within the obligations of either Colhouer under his contract with U.P. or Krieg under his subcontract with Colhouer, and were primarily for the benefit of Krieg. The trial court denied Krieg recovery for this item. We affirm.

■ Finally, we turn to Krieg's claim for interest. Krieg contends the trial court erred in not awarding interest on the amount due him from Colhouer. In *Public Market Co. v. Portland,* 171 Or 522, 130 P2d 624, 138 P2d 916 (1943) we held that interest on unliquidated damages for breach of contract is proper, where (1) the exact amount of damages is either ascertained or readily ascertainable,[⑨] and (2) the time from which the interest runs is easily ascertained. This rule has been followed in *Emrich v. Emery et al,* 216 Or 88, 100, 332 P2d 1045, 335 P2d 604, 337 P2d 972 (1959), *Corder v. A. & J. Lumber Co., Inc.,* 223 Or 443, 451, 354 P2d 807 (1960); and *Soderhamn Mach. Mfg. Co. v. Martin Bros. Container and Tbr. Prod. Corp.,* 415 F2d 1058 (9th Cir 1969). This court has specifically upheld the award of interest on the amount of a mechanic's lien

---

[⑨] As contrasted with, e.g., a personal injury claim: *Calcagno v. Holcomb,* 181 Or 603, 185 P2d 251 (1947).

claim from the date of filing of the lien. *Willamette Falls T. M. Co. v. Riley,* 1 Or 183, 187 (1955), followed in *Forbes v. Willamette Falls Electric Co.,* 19 Or 61, 63, 23 P 670 (1890) and in *The Victorian Number Two,* 26 Or 194, 198-199, 41 P 1103 (1894).

11. In this case both criteria were met.© We conclude that the trial court erred in this matter and that Krieg is entitled to interest from November 3, 1971, the date his mechanic's lien was filed.

The decree of the trial court is reversed in part and affirmed in part. The case is remanded for the entry of a decree in conformance with this opinion. None of the parties shall recover costs in this court.

---

© In his complaint Krieg asked for interest from September 21, 1971, the date his work was allegedly completed. However, in his brief he states that it should run from November 3, 1971, the date his mechanic's lien was filed.