Argued and submitted July 14, affirmed December 8, 1980,
reconsideration denied February 4,
petition for review denied April 7, 1981 (290 Or 727)

# CROWN NORTHWEST EQUIPMENT, INC.,
*Respondent - Cross-Appellant,*

*v.*

# DONALD M. DRAKE COMPANY,
*Appellant - Cross-Respondent.*

## (No. A7803-03653, CA 16052)

620 P2d 946

Frederic E. Cann, Portland, argued the cause for appellant - cross-respondent. With him on the briefs were Preston C. Hiefield, Jr. and Williams, Stark, Hiefield, Norville & Griffin, P. C., Portland.

Alfred A. Hampson, Portland, argued the cause for respondent - cross-appellant. On the briefs were Douglas B. Gordon and Hampson & Bayless, Portland.

Before Gillette, Presiding Judge, and Roberts and Campbell, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

This is an action at law in which plaintiff sought to recover damages from the defendant for breach of contract. On April 1, 1976, the plaintiff, as a subcontractor, entered into two written subcontracts with the defendant, who was the general contractor for the construction of a bus garage facility. The facility, known as the "Powell Satellite Operating Garage," was to be built for the Tri-County Metropolitan Transportation District (Tri-Met). Plaintiff agreed to install at the garage two bus washing systems, at a cost of $113,400, and a vacuum cleaning system, at a cost of $26,500. On June 30, 1976, the defendant cancelled each of the subcontracts prior to any performance by plaintiff. Plaintiff then brought this action for breach of contract. The trial court found for the plaintiff with respect to the bus-washing subcontract and for the defendant with respect to the vacuum cleaning subcontract. The defendant appeals from that portion of the judgment for plaintiff and plaintiff cross-appeals. We affirm.

This case turns on the application of the specifications issued by Tri-Met for the construction of the Powell garage. These specifications were lengthy and contained a detailed description of the requirements for each aspect of the garage. The subcontracts between plaintiff and defendant specifically incorporated the Tri-Met specifications, insofar as those specifications were relevant.

The Tri-Met specifications concerning the bus washing system provided, in pertinent part:

"BW-1 Bus Washing 9 water Reclamation System.

"1. General: Furnish and install two 'Drive-Thru Bus Wash Systems' to automatically clean roofs, sides, front and rear of standard transit buses driven through the system.

"Wash system to be Hanna Industries Model 5100 P-H Brush Washer Package with complete water reclamation system." (Section 15490, Paragraph 2.02 B)

The Tri-Met specifications concerning the vacuum cleaning system provided, in pertinent part

"Vacuum Cleaning System: Manufacturer: Hanna Industries, 20 HP Heavy Duty Vacuum System, others subject to prior approval." (Section 11051, Paragraph 2.01)

The specifications also contained the following general provision:

"*Specified Materials:* The use of brand names in specifying materials is for purposes of description and fixing quality. Unless otherwise noted, articles equal in quality and suitability will not be discriminated against. See Section 01800, 1.09 for approvals of substitutions."

This provision appears to be in response to ORS 279.017(1), which prohibits specifications for public contracts from requiring a specific product by brand name or mark, or from requiring the product of a particular manufacturer or seller.[1]

Section 01800, paragraph 1.09, of the Tri-Met specifications governs the substitution of materials:

"A.   *General:* All requests for substitution of materials in lieu of those specified or shown shall be submitted in writing and be received in the office of the Engineer not less than 7 days before date of submission of bid as established by the Contract. All approvals granted are subject to complete compliance with the Contract Documents. Requests shall be accompanied by samples, catalog cuts and complete technical data pertaining to the request and any other data the Engineer may require. Incomplete data will be subject to rejection. No verbal approvals will be given and all approvals will be issued in writing before such date of submission of bid. The following definitions of phrases stated after listed items (materials or products) in the Specifications determine the extent to which substitutions may be proposed.

"B.   *'OR APPROVED SUBSTITUTION':* These items require specific approvals outlined above.

"C.   *'OR EQUAL' OR 'SIMILAR TO':* These items do not require prior approval as they are considered items of standard manufacture which perform equal function and have equal quality to those specified. Where requested at the start of the job, the Subcontractor or material supplier shall submit for approval items which he considers equal

---

[1] ORS 279.017(1) provides that:

"(1) Specifications for public contracts shall not expressly or implicitly require any product by any brand name or mark, nor the product of any particular manufacturer or seller unless the product is exempt under subsection (2) of this section."

to those specified. The Engineer reserves the right to reject any items which in his judgment are not equal to those specified.

"D. Substitution will not be approved for any item not covered by an indication of an allowable substitution listed above."

The basic facts in this case are undisputed. At all times it was clear to both parties that plaintiff intended to install both a bus washing system and a vacuum cleaning system different from those specified. On April 1, 1976, when plaintiff and defendant entered into the subcontracts, the time for "prior approval" under paragraph 1.09(A) was long past: The deadline for prior approval of substitutions was February 18, 1976. At the time the subcontracts were signed, both the plaintiff and the defendant knew that the time limit for prior approval had passed; the defendant knew further that the plaintiff had not sought and did not have prior approval for its equipment. Both parties thought that the plaintiff's systems could and would be approved under the "or equal" provisions of paragraph 1.09(C) of the specifications. Prior approval was not needed under that section; approval could be requested at any time prior to the start of the job. Plaintiff assured the defendant that its equipment was equal in function and quality to the Hanna models specified. On that basis, the parties entered into the subcontracts.

Sometime in early April, 1976, the defendant submitted shop drawings on plaintiff's systems to Tri-Met's architects. These shop drawings were routinely required for all aspects of the general contract. The defendant did not indicate to Tri-Met that it was seeking, and in fact it was not seeking, "or equal" substitution for these systems.

On April 14, 1976, Tri-Met's architect, Thomas Whittaker, wrote to the defendant referring to section 01800, paragraph 1.09(A) of the specifications and saying that plaintiff's systems had to be rejected because plaintiff had not requested approval prior to bid. Whittaker indicated that, because prior approval had not been sought, Tri-Met would have to adhere to the Hanna Systems specified. On May 26, 1976, defendant sent plaintiff a copy of Whittaker's letter. On June 30, 1976, defendant wrote to plaintiff cancelling the subcontracts because of Tri-Met's rejection based on lack of prior approval.

The parties agree that the central issue in this case is whether paragraph 1.09(A), the "prior approval" section, or paragraph 1.09(C), the "or equal" section, applies to substitutions for the bus washer and vacuum cleaning systems. The trial court found that paragraph 1.09(C) applied to the bus washing system and that defendant had wrongfully cancelled that subcontract without first attempting to gain approval of plaintiff's system from Tri-Met's engineers. With respect to the vacuum cleaning system, the trial court found paragraph 1.09 (A) to be applicable and, because the parties had been mutually mistaken as to the method and time of approval for substitutions when they entered into that subcontract, ruled that the defendant was justified in cancelling it.

We turn first to plaintiff's cross-appeal. Plaintiff argues that the "prior approval" section is not applicable to substitutions for the vacuum cleaning system because requiring prior approval would conflict with provisions of the subcontract which do not condition performance upon obtaining prior approval by Tri-Met's engineer. Plaintiff draws our attention to paragraph 3 of the subcontract, which incorporates the Tri-Met specifications into the subcontract and provides that "* * * if any provision of this contract conflicts with the plans and specifications * * * this contract shall govern."

■■    The construction of a contract, as a general rule, is a question of law. The exception to this rule is where the language of the contract is ambiguous or where technical words, local phrases, or terms of art are used, in which case the question becomes one of fact and evidence is properly admitted on the contract's meaning. *Timberline Equip. v. St. Paul Fire 9 mar. Ins.,* 281 Or 639, 643, 576 P2d 1244 (1978). Whether a contract is ambiguous is a question of law. *Evenson v. Masonry, Inc. v. Eldred,* 273 Or 770, 772, 543 P2d 663 (1975).

■    The language of the Tri-Met specifications with respect to substitutions for the vacuum cleaning system is clear. Section 11051-1, paragraph 2.01, *supra,* states that the use of systems other than the specified Hanna model will be considered "subject to prior approval." As the language of the specifications is clear, there is no room for

construction and no need to examine extrinsic evidence as to the specification. The subcontract does not conflict with the specifications; it makes no mention of any particular method of approval by Tri- Met. Thus, the entire agreement between the parties is subject to construction without resort to other evidence. The plaintiff agreed by the terms of the subcontract to be bound by the Tri-Met specifications and knew that its vacuum cleaning system would have to be approved by Tri-Met's engineer. When the plaintiff and defendant signed the subcontract, the parties were mistaken as to the time and method of approval for plaintiff's alternative vacuum cleaning system. This mistake was mutual and fundamental to the performance of the contract. *Shop. Centers v. Stand. Growth Prop.,* 265 Or 405, 422, 498 P2d 781, 509 P2d 1189 (1973). Once the defendant discovered the mistake, it was entitled to cancel the subcontract.

We turn now to a consideration of the bus washing system in light of the specifications. The trial court found, in pertinent part, that:

"* * * * *

" 9. At all material times after executing Plaintiff's subcontract to provide bus washing systems, Defendant knew that 'or equal' approval from the Project Engineer was needed in order for Plaintiff to perform such Subcontract and Defendant assumed the responsibility to obtain such approval with Plaintiff's assistance.

"10. The evidence is uncontroverted that Plaintiff's B-12 bus washing system was superior to the Hanna Industries Model 5100P-II bus washing system.

"11. At no time prior to terminating Plaintiff's Subcontracts did Defendant request approval of Plaintiff's B-12 bus washing systems by the Project Engineer pursuant to Section 1.09(C), nor did Defendant attempt to point out to Tri-Met that Plaintiff's shop drawings detailed a B-12 system rather than a Hanna Industries system or any of the properties of the B-12 system which made it equal to or better than the Hanna Industries system. * * *"

The trial court concluded that:

"* * * * *

"4. Section 1.09(C) was the only method by which Plaintiff's B-12 Bus Washing System could be approved by the Project Engineer because 'or equal' items did not

require prior approval under Section 1.09(A). Therefore, Section 1.09(A) was not applicable to the bus washing systems' Subcontract. Plaintiff would have been bound by a decision by the Project Engineer under Section 1.09(C) disapproving the Plaintiff's B-12 system because of Paragraph 5(m) of the bus washing system Subcontract, but no such decision was ever made by such Engineer.

"5. It was implicit in Plaintiff's Subcontract to furnish bus washing systems that Plaintiff had the right to have its proposed bus washing systems evaluated by the Project Engineer before Defendant could cancel for lack of approval.

"6. Defendant, as the general contractor on the project, was under a duty and charged with the responsibility to seek approval by the Project Engineer of the subsection of Plaintiff's bus washing systems under Section 1.09(C).

"7. The Project Architect's rejection on April 14, 1976, of Plaintiff's shop drawings which was based on Section 1.09(A), was erroneous as to Plaintiff because Section 1.09(A) was inapplicable and because Section 1.09(A) allocated the right of rejection thereunder to the Project Engineer and not to the Project Architect.

"8. Defendant's cancellation on June 30, 1979, of Plaintiff's subcontract to furnish bus washing systems was premature and wrongful, and constituted a repudiation and breach of contract by Defendant, because Defendant had failed to discharge its duty to attempt to obtain approval of Plaintiff's bus washing systems by the Project Engineer pursuant to Section 1.09(C) of the Construction Specifications."

The defendant raises sixteen assignments of error with respect to this portion of the trial court's judgment. He individually attacks many of the trial court's findings and conclusions. The issue underlying virtually all of these assignments of error is the question of whether paragraph 1.09(A) or paragraph 1.09(C) applies to substitution for the specified Hanna bus washing system.[2] Defendant maintains that the plaintiff is bound by the architect's letter of

---

[2] Defendant also argues that the trial court was without subject matter jurisdiction to decide the validity of the specifications. Defendant claims the plaintiff's interpretation relies on the alleged invalidity of the specifications and that plaintiff should have sought review pursuant to the Administrative Procedures Act. The trial court did specifically find that ORS 279.017 prohibited Tri-Met from not considering plaintiff's B-12 bus washing system and vacuuming

April 14, 1976, refusing to consider plaintiff's alternative system because of the failure to seek prior approval. Defendant argues further that, even if paragraph 1.09(C) is found to be applicable, the trial court erred in finding that the defendant had a duty to seek "or equal" approval from Tri-Met for plaintiff's bus washing system.

The resolution of defendant's claim here turns first upon an examination of the language used in the specifications. Unlike the specifications pertaining to the vacuum cleaning system, the provisions relating to the bus cleaning system do not specify whether "prior approval" is necessary for substitutions. The requirements for the bus washing system are contained in section 15490, entitled "Special Equipment." Section 15490, in turn, follows section 15410, entitled "Mechanical." The general provisions of section 15010 provide that requests for substitutions be submitted in writing "per section 01800," the section in which both paragraphs 1.09(A) and (C) appear. It does not indicate which paragraph applies. As previously noted, paragraph 1.09 contains two methods or time limits for requesting substitution of materials in lieu of those specified. Subparagraph (C) does not require "prior approval," but only applies to items of standard manufacture which perform equal functions and have equal quality to those specified. Paragraph 1.09(A) applies to all other items and requires prior approval. The specifications are unambigious and in no way inconsistent. They apply in different situations. Since the specifications are clear, extrinsic evidence of the parties' intent is irrelevant.

---

system solely on the basis that such systems were not the specified Hanna Industries systems. However, the trial judge did not find that the specifications were invalid; nor is there any indication that his interpretation of the specifications is based on the belief that they must be interpreted in a particular way to preserve their validity. The validity of the specifications was simply not an issue in this case. In fact, the trial court's finding noted further that

"Substitutions for the Hanna Industries bus washing and vacuuming systems named in Sections 15490 and 11051 of the Construction Specifications were permitted by the General Construction Contract and Construction Specifications."

The only restriction on substitution was the manner and time limits set for their approval.

■     The trial judge concluded that, where no "subject to prior approval" language was present, plaintiff's bus washing system was an "or equal" system to which paragraph 1.09(C) applied. We agree. The very lack of the "subject to prior approval" language makes it clear, we think, that as to the *bus washing* system, no prior approval would be required. There is no claim by defendant that the plaintiff's bus washing system does not otherwise use the criteria of paragraph 1.09(C).[3]

■     Defendant next claims that Crown was bound to accept the interpretation of Whittaker, Tri-Met's architect, as stated in his rejection letter. Whittaker rejected Crown's systems for lack of prior approval because he was of the opinion that paragraph 1.09(A), and not 1.09(C), applied.

The trial court concluded, in part, that the rejection letter was erroneous because paragraph 1.09(A) allocated the right of rejection to the Project Engineer and not to the architect. (See conclusion #7) This is true. Paragraph 1.09(A) states that all requests for substitution shall be submitted to the Project Engineer. Paragraph 1.09(C) gives the engineer the right to reject "or equal" items submitted for substitution.

Defendant argues, however, that the *subcontract* uses these two terms interchangeably. The subcontract simply contains the words architect or engineer with a blank space in which the names of Tri-Met's architects and engineers are filled in. This does not affect the specifications in any way.

Defendant also draws our attention to paragraph 5m of the subcontract, which states that the subcontractor shall be bound "* * * by any interpretation or construction of the contract documents or any decision on any claim *arising out of the performance of the work* made by owner, architect or engineer * * *." In this case, the architect's letter would not be binding because his interpretation is

---

[3] Defendant argues for the first time in its reply brief that the plaintiff's bus washing system was not an item of "standard manufacture," and that paragraph 1.09(C) is therefore inapplicable. Defendant does not, however, indicate how this theory was brought to the attention of the trial judge. We therefore decline to consider it.

not related to the performance of work. He was interpreting the meaning of the contract when that had nothing to do with the performance of work. Whittaker was not making a decision within his particular expertise or authority or a decision the contract empowered him to make. *See Krieg v. Union Pacific Land Res. Corp.,* 269 Or 221, 231-232, 525 P2d 48 (1974); *Highway Com. v. Heintz Const.,* 245 Or 530, 541-542, 423 P2d 175 (1967).

Defendant claims that the trial court erred in finding that defendant assumed the responsibility to obtain "or equal" approval (finding #9); in concluding that defendant as general contractor was under a duty and charged with the responsibility to seek such approval (conclusion #6); and that defendant's cancellation of the subcontract was improper because it failed to discharge its duty to attempt to obtain approval of plaintiff's systems (conclusion #8).

The evidence on this question is as follows. Sorg, defendant's employe, submitted plaintiff's shop drawings to Tri-Met, as was necessary for all aspects of the general contract. He did not indicate that "or equal" substitution was being requested, nor did he ever request such.

Fowler, plaintiff's employe, testified that, after Whittaker's letter of April 14, Sorg told him that there was a problem with plaintiff's proposal but that he, Sorg, would handle it and that Fowler should not contact Tri-Met. Sorg did not specifically state what the problem was. Fowler testified that he felt that, once the general contract was signed, he did not have the right to go beyond defendant to Tri-Met's engineers and architects. Fowler admitted, however, that Sorg never said that defendant would obtain approval for plaintiff's systems for plaintiff.

Whittaker testified that when prior approval is required there is no indication as to whose responsibility it is to seek approval. However, once the general contract is signed, he indicated that Tri-met prefers to work through the general contractor as opposed to the subcontractor. Paragraph 1.09(C), on the other hand, provides that items to be considered for "or equal" substitution are to be submitted by the subcontractor or material supplier.

■ We think from the above evidence that the trial judge could have concluded that defendant had undertaken to obtain approval for plaintiff's product. We do not mean to imply, however, that we should have so found, were the case here for *de novo* review.

Finally, defendant makes two contentions concerning the award of attorney's fees, and of one item of cost. The cost item—the expense of a deposition—was one which the trial judge could, in his discretion, have found appropriate. *See Kendall v. Curl,* 222 Or 329, 340, 352 P2d 227 (1960). The assignment concerning attorney's fees is based upon the assumption that defendant is entitled to prevail on the bus washing system subcontract. This assumption is incorrect.

Affirmed.